**NORTHWEST ACCEPTANCE CORPO-
RATION, Plaintiff-Appellant,**

v.

**HEINICKE INSTRUMENTS COMPANY,
Defendant-Appellee.**

No. 28553.

United States Court of Appeals,
Fifth Circuit.

May 5, 1971.

Herbert L. Nadeau, Shutts & Bowen, Miami, Fla., for plaintiff-appellant; Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., of counsel.

Aaron S. Podhurst, Robert Orseck, Podhurst & Orseck, P.A., Miami, Fla., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, DYER and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This breach of contract action was brought by plaintiff-appellant, Northwest Acceptance Corporation, an Oregon financier of commercial paper, against defendant-appellee, Heinicke Instruments Company, a Florida manufacturer of cleaning equipment, for approximately $160,000.00, the unpaid balance on certain "deferred payment paper" which defendant Heinicke assigned to plaintiff Northwest.

The factual complexity in this case is only overshadowed by the slipshod business practices of the parties. Fortunately, however, we are able to draw freely upon the district court's opinion concerning the circumstances leading up to this controversy.

Heinicke, a manufacturer and seller of cleaning equipment, sought to obtain financing for its sales to its customers. Northwest was in the financing business.

Heinicke and Northwest entered into a contract in October 1965 which provided that if Heinicke offered to sell notes of its customers, together with the underlying security of title instruments (deferred payment paper) to Northwest, a certain procedure would be followed upon Northwest's decision to buy the paper.[1] The court below described the procedure outlined in the contract as follows:

"Heinicke would make a sale to a customer. In return, Heinicke would get a note from the customer together with a security or title instrument. Heinicke would assign these to Northwest, which, upon acceptance, would pay Heinicke the amount due. Then the customer would pay Northwest as provided in the agreement.

"The contract provided that Heinicke could sell the customer's note and underlying security to Northwest and that Heinicke would endorse or assign the paper to Northwest. It also provided that should Heinicke fail to execute the endorsement or assignment, Northwest would have the right to execute the assignment for it. The contract further provided that in the case of a default in payment, Heinicke would repurchase the paper it sold, upon the demand of Northwest."

This suit was based upon the defaults by certain Heinicke customers involving 12 accounts, and plaintiff Northwest demands that defendant Heinicke should be required to repurchase the paper on these defaulted accounts. We divide our discussion into two groups of accounts in order to clarify the issues raised by the parties.

### (1) The Langtry, Williams, Bordeaux and McCully Accounts

In the first 9 accounts sued upon (the 3 Langtry accounts, the 2 Williams accounts, the Bordeaux account, and the 3 McCully accounts), the trial court found that the contractual scheme was not followed because the notes were made directly from Heinicke's dealers to Northwest, and not to Heinicke and by it assigned to Northwest.

Although the contract did not provide that Northwest could take the notes directly from these customers, the district court failed to see the significance in the fact that the trust receipts and conditional sales contract forms were assigned with an individual express guarantee in accordance with the underlying agreement. Each assignment contained the following provisions:

"For value received we hereby sell and assign to Northwest Acceptance Corporation, its successors and assigns, the annexed above-named contract, together with all our right, title and interest in the property described therein, and all our rights and remedies thereunder, including the right to collect any and all installments due and to become due thereon and to take, in our or its name, any and all proceedings thereon or thereunder we might otherwise take * * *. We guarantee the payments promptly when due of the amount of each and every installment payable thereunder and the payment on demand of the entire unpaid balance at the date of default in the event of any default by the buyer under the said contract."

■■ A general rule in the interpretation of contracts is that the court will look to the agreement between the parties as a whole. State of Florida for Use and Benefit of Westinghouse Electric Supply Co. v. Wesley Construction Co., 316 F.Supp. 490, 495 (S.D.Fla., 1970); 7 Fla.Jur., Contracts § 77. The practical interpretation which the parties themselves placed on the contract is entitled to great weight in determining its meaning. Pickren v. United States, 378 F.2d 595, 600 (5th Cir., 1967). Thus the fact that the notes were made payable to Northwest does not alter or discharge the legal effect of the guarantee, especially in view of the basic intention of the parties to obtain financing by Northwest's purchase of the deferred payment

---

1. This paper would result from Heinicke's sale of its own cleaning equipment to its customers.

obligations of Heinicke's customers. In interpreting the agreement as a whole, we cannot overlook the guarantee.[2]

■ Heinicke, a manufacturer, arranged the financing in order that the customers could purchase its equipment. It was willing to take the risk of their default, and now it is time to face up to the obligation. The court below erred in failing to hold that Northwest has the right to demand that Heinicke pay the amounts due under the contracts.

### (2) *The ReMac Accounts*

As to the 3 ReMac accounts, the court below allowed recovery on the first one, No. 6–1078,[3] and defendant Heinicke does not question this ruling, acknowledging that the contract procedures were followed.

The district court, however, found that for the other two ReMac accounts, Nos. 5–1158 and 5–1178, an additional step had taken them out of the course of financing provided for in the contract:

"In each of those accounts, ReMac gave a note in the same amount as that appearing in the respective trust receipt documents to Heinicke. The notes were each for 8.5% interest and named Heinicke as payee. On July 28, 1966, after the due date of each note, two additional notes, one for each account, were executed by ReMac directly to Northwest. Both of these 'additional' notes were for a smaller amount than their respective original notes, and both bore a 10.5% interest rate instead of the original 8.5%. The original notes were not cancelled or returned to the maker."

The issue before us, as the district court recognized, is whether the July 28th notes were renewal notes or new obligations. If they were simply renewals of the original notes defendant Heinicke was required to repurchase them. If they constituted a new obligation, or novation, then Heinicke was discharged as a guarantor.

The district court held that they were not renewal notes because there was a "material change in the indebtedness [and] because the interest rate was raised. Northwest in effect, released Heinicke on the notes because it got additional 2% interest. Although by the contract, Heinicke gave Northwest the power to grant extensions of time, the mere extension of time, as in the case of a renewal note, is substantially different from an extension of time coupled with a new payee and a higher interest rate."

■ We disagree with the lower court's ruling here for several reasons. First, the contract and separate assignments between the parties gave Northwest power not only to grant extensions of time, but also to compromise and adjust any rights against Heinicke's customers, and otherwise handle the making

---

2. An indication of the interpretation the parties themselves gave to the agreement is revealed in Heinicke's letter to Northwest dated August 12, 1966:

"Mr. Randolph J. McMaster
Executive Vice President
Northwest Acceptance Corporation
P. O. Box 2185
Portland, Oregon
Reference: Distributor Default
Dear Mr. McMaster:
Inasmuch as we have a major degree of responsibility in connection with the distributors' notes, it would seem that we would have the option to take them over, while repossessing the equipment in question.

It is not within the realm of possibility that we can pay off these notes on short demand, and, therefore, we would ask your confirmation that the notes be signed over to us, in cases of default, and that we have the option of carrying out the stipulated payment terms or paying them off.
Sincerely yours,
HEINICKE INSTRUMENTS COMPANY
S/ E. E. Koehler
E. E. Koehler
Comptroller"

3. Northwest was granted recovery on this account for $4,395.05, the amount due as a result of ReMac's default on this note.

of collections in accordance with Northwest's business judgment.[4]

Secondly, the taking of the renewal notes did not necessarily constitute a novation. Although there has been general disagreement concerning the effect of a renewal note upon the original, the view in Florida is that a renewal note does not operate as a payment or discharge of the note in renewal of which it is given unless there is an express agreement between the parties to that effect. Cheves v. First National Bank, 79 Fla. 34, 83 So. 870, 872 (1920); Board of Public Instruction v. State, 145 Fla. 482, 199 So. 760 (1941); 4A Fla.Jur., Bills, Notes, § 192. In the *Cheves* case the vendors, acting through a bank, sold property to the vendees, who executed two $1,000 notes to the bank. Unable to pay one of the notes and in return for an extension of time, the vendees executed a new note for $1,335, which was the principal plus interest due under the first note, and at the same time executed a mortgage in favor of the bank. Although the new note had a different face value, the court held that there could not be a discharge of the original indebtedness or a novation absent express agreement to that effect. In the case *sub judice* there was no evidence of an express agreement or an intent that the new ReMac notes were to discharge the underlying debt. On the other hand, the new notes were marked on the ledger cards as renewal notes and Northwest retained the original notes— a further indication of intent not to extinguish the underlying obligation.

Finally, we note that the district court believed the July 28th notes were not renewal notes because: "Anderson v. Trueman, [100 Fla. 727] 130 So. 12 (Fla., 1930), defines renewal notes as ones which 'effect no change in the form, amount, or material substance of the indebtedness,'" and here the increased interest rate was a material change. In the *Anderson* case, Trueman and Kirkpatrick executed a note for $22,500 payable in one year. The note was secured by a mortgage executed by these men and their wives. The note granted the creditor the right to extend payment. When it matured the mortgagors were not in a position to pay and thus, with the mortgagee's consent, the note was renewed for 90 days upon payment of interest. Similar indulgences were subsequently granted. When the creditor sought to foreclose, the wives contended that they were sureties and as such were released by the taking of the new notes. The court rejected the wives' argument and said:

"The law is well settled in this country that an extension of time or the material alterations in the terms of payment of a promissory note without the approval of the surety discharges him and the security given.

\*　　\*　　\*　　\*　　\*　　\*

"The note attached to the mortgage and the subsequent renewals thereof contained the following stipulation binding all parties to the mortgage:

"'We and each of us consent that the amount of this note or any part hereof may be extended without further notice.'

"From an examination of the record we cannot escape the conclusion that

4. Paragraph 9 of the repurchase agreement provided:
   "We waive presentment, demand, notice and protest as to all paper and consent that you may grant extensions of time, make compromises with and release the obligor and other persons liable on the paper, agree to transfer of the equipment to a new obligor, and otherwise handle the making of collections in accordance with your business judgment, without affecting our liability hereunder."

The separate assignments included the following statement:
   "\* \* \* We give express permission to assignee to release, on terms satisfactory to assignee, by operation of law or otherwise, or to compromise or adjust any and all rights against and grant extensions of time of payment to the buyer or any other persons obligated on the contract or note or notes, without notice to us and without affecting our liability hereunder."

the mortgage secured the payment of a debt of $22,500 of which the note was the mere evidence; that the original note attached to the mortgage a portion of which is here quoted authorized the renewal of all or any part thereof without notice; and that all subsequent extensions were nothing more than renewal notes to evidence the secured indebtedness. They effected no change in the form, amount, or material substance of the indebtedness and were authorized by the terms of the note which was by apt words made a part of the mortgage. Under such circumstances, the rule as to discharge of sureties has no application, but the mortgage remains a lien until the debt it was given to secure is satisfied and is not affected by a change of the note or by giving a different note as evidence of the debt unless there can be an express agreement to the contrary. Cheves v. First Nat. Bank of Gainesville, 79 Fla. 34, 83 So. 870; Thompson on Real Property, § 4710, 21 R.C.L. 70 and 75.

\* \* \* \* \* \*

"It is our opinion that the mortgage was in such form as to secure the payment of a debt of which the note described herein was the evidence; that it was properly executed for that purpose; and that subsequent renewals in this case did not release the lien of the mortgage under the rule as to release of sureties here stated." 130 So. at 14.

The court's remark concerning the similarity of the new notes to the old ones related to the scope of the wives' consent to the extension. Nevertheless, the court adhered to the requirement of an express agreement as to novation.

5. In *Cantrill* a part payment on an original note was made and a renewal note executed for the balance with a 1% higher interest rate. The court stated:

"Turning to the note, it is clear that the parties to the transaction did not intend that the new note was to extinguish the original obligation for the note specifically recites that it is 'Renewal No. 1 Orig. Amt. $30,310.00.' It also recites the date of the original loan

The fact that the July 28th notes contained an additional 2% interest does not require a finding of novation. See In re Cantrill Construction Co. (Commercial Bank of Middlesboro v. Carter), 418 F. 2d 705 (6th Cir., 1969).[5] Likewise, the mere fact that the new notes were payable to Northwest and not to Heinicke is not controlling in view of the finding that the procedures prescribed by the contract were followed with respect to the ReMac accounts.

We therefore find that the district court erred by denying recovery on the other two ReMac transactions.[6] Its judgment is reversed and remanded with directions to enter judgment for Northwest upon these two ReMac accounts, and on the nine accounts discussed in part (1) of this opinion.

Reversed and remanded with directions.

and refers to the collateral for that loan. It is difficult to imagine a clearer case than this. The parties' intention was only to extend the time for payment, not to extinguish the obligation.

"The fact that the interest rate was raised from 6% to 7% does not negate this conclusion." 418 F.2d at 707.

6. i.e., Nos. 5–1158 and 5–1178.