**David R. TRAYNOR, Plaintiff,**

v.

**George A. WALTERS and Ruth Walters t/d/b/a Riverview Nursery, Defendants.**

**Civ. A. No. 68–508.**

United States District Court,
M. D. Pennsylvania.

May 15, 1972.

Frederick D. Kessler, Lewisburg, Pa., for plaintiff.

A. Thomas Wilson, Lewisburg, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MUIR, District Judge.

### I. FINDINGS OF FACT

1. Plaintiff David R. Traynor ("buyer") was a citizen of New York at the time of the commencement of this action.

2. Defendants George A. Walters (deceased) and Ruth Walters ("sellers") were citizens of Pennsylvania at the time of the commencement of this action.

3. The amount in controversy is in excess of $10,000.

4. In 1967, the buyer was a wholesaler of Christmas trees who had supplied New York City florists on a small scale for several years.

5. In 1967, the sellers were growers of Christmas trees in central Pennsylvania.

6. In the fall of 1967, the buyer and the sellers entered into a contract under which buyer agreed to buy and sellers agreed to sell a quantity of Christmas trees for delivery in December, 1967.

7. The sellers warranted that the trees to be delivered under the contract would be of top quality.

8. The sellers knew at the time of contracting that the buyer intended to resell the trees to quality florists in New York City and that the buyer would suffer lost profits on the sellers' failure to perform the contractual terms relating to quantity, quality and time of delivery.

9. On September 17, 1967, the sellers, by defendant Ruth Walters, filled out and signed a purchase order blank for 1630 trees of various sizes, species and prices and received a down payment of $170.00 from the buyer toward the purchase price of $2,517.00. The initial contract called for the following trees:

- 100 Austrian Pine at $1.20
- 1300 Scotch Pine at $1.20
- 50 Scotch Pine 3–4 ft. at $1.00
- 20 Small White Spruce at $1.00
- 90 White & Norway at $2.25
- 40 Douglas Fir at $5.00
- 20 Colorado Blue Spruce (green) at $3.50
- 10 Colorado Blue Spruce (blue) at $5.00

10. The sellers agreed as part of the contract to deliver the order on December 8 or 9.

11. On October 29, 1967, the buyer made an additional payment of $400.00, and the parties augmented the September 17 order by agreeing on the sale of an additional 50 large Scotch Pine trees at a contract price of $1.65 per tree for delivery on December 8 or 9.

12. There was no contract between the parties obligating the sellers to supply the buyer's requirements in Christmas trees up to 1000 trees in excess of the September 17 and October 29 orders in the same proportions as designated in the orders.

13. In addition to the 1630 trees, the subject matter of the September 17 contract and its amendment on October 29, the buyer and sellers agreed to the sale of the following 56 trees:

- 31 Douglas Fir at $5.00
- 25 Frazier Fir at $2.65

14. On December 7, 1967, the buyer received at the delivery site in Pennsylvania the following 625 trees:

- 100 Austrian Pine
- 315 Scotch Pine (assigned to the order of 1300 Scotch Pine)
- 50 Small Scotch Pine
- 20 Small Spruce
- 50 White & Norway Spruce
- 10 Colorado Blue Spruce (blue)
- 5 Colorado Blue Spruce (green tint)
- 50 Large Scotch Pine

15. The following 185 trees of the December 7, 1967, delivery conformed to the contract and were accepted by the buyer:

- 50 Small Scotch Pine
- 20 Small Spruce
- 50 White & Norway Spruce
- 10 Colorado Blue Spruce (blue)
- 5 Colorado Blue Spruce (green)
- 50 Large Scotch Pine

16. The following 440 trees of the December 7, 1967, delivery did not conform to the contract:

- 315 Scotch Pine (assigned to the order of 1300 Scotch Pine)
- 25 Frazier Fir
- 100 Austrian Pine

17. The 440 non-conforming trees were dry, poorly colored, unsheared and poorly shaped. They had large, woody bases, suffered from needle-drop and had few needles on the lower branches.

18. In accordance with the contract, the trees were baled for transport prior to delivery to the buyer, and it was, therefore, impossible for the buyer to inspect the shipment for conformity before the cargo reached its destination in New York.

19. The truck bearing the December 7 delivery arrived in New York early December 8 and the buyer immediately inspected the shipment.

20. On the evening of December 8, the buyer notified the sellers by telephone that the 315 Scotch Pine, the 100 Austrian Pine and the 25 Frazier Fir did not conform to the contract.

21. On December 13, 1967, the sellers made delivery of 271 trees, consisting of the following:

  200 Scotch Pine (assigned to the order for 1300 Scotch Pine)
   71 Douglas Fir

22. These trees were, likewise, baled for shipment before delivery and could not be inspected by the buyer before their arrival in New York.

23. On December 14, the buyer advised the sellers by telephone that the 200 Scotch Pine trees on the December 13 shipment did not conform to the contract.

24. The 71 Douglas Fir conformed to the contract and were accepted by the buyer.

25. On December 14, the sellers tendered delivery of 600 more Scotch Pine trees.

26. The last day for the sellers' delivery had originally been set as December 9, but by subsequent agreement of the parties the period for delivery was changed to December 6–10.

27. The buyer thereafter, during the first two weeks of December, waived the time previously set for delivery and stated his willingness to accept trees until December 16.

28. On December 14, the buyer refused to accept the sellers' tender of an additional 600 Scotch Pine trees.

29. However, on the same day, the buyer demanded performance of other portions of the contract.

30. The buyer rented a construction site in Manhattan, hired a night watchman, and sold the rejected, non-conforming trees for the sellers' account. In the process of disposing of the sellers' trees, the buyer incurred incidental expenses totalling $160.00 and contributed his own labor in unloading and selling the trees, for which the sum of $120.00 (40 hours labor at $3.00 an hour) is reasonable compensation.

31. The shipping cost per tree for the buyer's operation was $.33 per tree, buyer's burden.

32. The bailing cost per tree was $.15 per tree, buyer's burden.

33. Through the sellers' failure to deliver 855 trees called for under the contract, the buyer saved expenses of $.48 per tree, totalling $410.40.

34. The buyer's receipts for rejected trees sold for the sellers' account totalled $1,313.75.

35. The buyer's lost profits for undelivered and nonconforming trees were as follows:

| | |
|---|---:|
| 100 Austrian Pine | $ 480.00 |
| 700 Scotch Pine | 4,060.00 |
| 40 White & Norway Spruce | 190.00 |
| 15 Colorado Blue Spruce (green) | 71.25 |
| | $4,801.25 |

36. The contract price for trees accepted by the buyer totalled $687.50, broken down as follows:

| | |
|---|---:|
| 50 small Scotch Pine at $1.00 | $ 50.00 |
| 20 small White Spruce at $1.00 | 20.00 |
| 50 White & Norway Spruce at $2.25 | 112.50 |
| 10 Colorado Blue Spruce (blue) at $5.00 | 50.00 |
| 5 Colorado Blue Spruce (green) at $3.50 | 17.50 |
| 71 Douglas Fir at $5.00 | 355.00 |
| 50 large Scotch Pine at $1.65 | 82.50 |
| | $687.50 |

37. The baling costs for the above accepted trees at $.15 per tree total $38.40.

38. The buyer paid $2,147.25 toward the contract price.

39. The sellers retain $1,421.35 for the buyer's account.

## II. DISCUSSION

This is a buyer's action against a grower of Christmas trees for damages for breach of a sales contract. The case was tried without a jury and is before the Court for findings of fact and conclusions of law.

Jurisdiction is founded upon 28 U.S.C. § 1332(a) (1).

It is undisputed that the applicable law is the law of Pennsylvania. The provisions of the Uniform Commercial Code govern. 12A P.S. §§ 2–107, 2–102.

1. *Liability for Breach of Contract.* It is stipulated between the buyer and the sellers that they entered into a contract for the sale of 1680 Christmas trees during fall of 1967 and that the trees contracted for were to be of the following descriptions, quantities, and prices:

```
 100 Austrian Pines at $1.20
1300 Scotch Pine at $1.20
  50 Scotch Pine, 3–4 feet at $1.00
  20 Small White Spruce at $1.00
  90 White & Norway Spruce at $1.00
  40 Douglas Fir at $5.00
  20 Colorado Blue Spruce (green)
       at $3.50
  10 Colorado Blue Spruce (blue) at
       $5.00
  50 Large Scotch Pine at $1.65
```

The contract called for trees of "top quality."

The first delivery under the contract was made on December 7, 1967, and consisted of 625 trees of the following descriptions:

```
100 Austrian Pine
315 Scotch Pine
 50 Small Scotch Pine
 20 Small Spruce
 50 White & Norway Spruce
 10 Colorado Blue Spruce (blue)
  5 Colorado Blue Spruce (green)
 50 Large Scotch Pine
```

Of this delivery, 50 small Scotch Pine, 20 small Spruce, 50 White & Norway Spruce, 10 Colorado Blue Spruce (blue), 5 Colorado Blue Spruce (green), and 50 large Scotch Pine, or a total of 185 trees, were accepted by the buyer as conforming to the contract, and no claim for damages is made with respect to these trees.

The balance of the trees of the December 7 delivery, totalling 440 trees and including 315 Scotch Pine, 100 Austrian Pine and 25 Frazier Fir, were trees of very poor quality, which did not conform to the contract because they were dry, poorly colored, unsheared and poorly shaped and because they had large bases and few needles, especially on the lower branches. Each of the 625 trees of the December 7 delivery was baled prior to being loaded into the buyer's truck for shipment to New York City. The truck arrived in New York City early on December 8 and the trees were unbaled and inspected the same day. Because the trees were baled before delivery, it was impossible for the plaintiff-buyer or his agents to ascertain whether the trees conformed to the contract until the shipment arrived at its destination and the trees could be unbaled. On the same day, the buyer telephoned the sellers from New York to inform them that 440 of the trees of the December 7 delivery did not conform to the contract.

In order to recover damages for non-conformity of delivered goods, a buyer under these circumstances must effectively reject the tendered goods. Rejection must be within a reasonable time after delivery or tender of delivery and is ineffective unless the buyer seasonably notifies the seller. 12A P.S. § 2–602(1). Here, notification within 24 hours of delivery was within a reasonable time under the circumstances. The 440 trees were rightfully rejected, and the rejection was effective. With respect to the non-conforming trees in the December 7 delivery, therefore, the buyer is entitled to recover damages.

■ Christmas trees which have been cut for marketing during the Christmas season are goods which are "perishable or threaten to decline in value speedily." 12A P.S. § 2–603(1). Therefore, since the sellers had no agent or place of business in New York City, the buyer, a "merchant" within the scope of 12A P.S. § 2–104, was under a duty after rejection of the goods in his possession to follow any reasonable instructions from the sellers with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the sellers' account. Here, the buyer incurred expenses in connection with caring for and selling the non-conforming trees, including rental of a site from which to sell the trees, and wages for salesmen and a night watchman. In addition to incidental and consequential damages, the buyer is entitled to recover his expenses incurred in disposing of the non-conforming trees for the sellers' account. 12A P.S. § 2–603(2).

■ As to the trees accepted, the buyer must pay at the contract rate. 12A P.S. § 2–607(1).

On December 13, 1967, the sellers tendered a second delivery, consisting of 200 Scotch Pine and 71 Douglas Fir. The 200 Scotch Pine did not conform to the contract because they were poorly shaped and had no needles on the lower branches. The 71 Douglas Firs conformed to the contract, and no claim for damages is made with respect to them. On December 14 the buyer advised the sellers by telephone that the 200 Scotch Pine trees did not conform to the contract and refused the sellers' offer for a further delivery of 600 more Scotch Pine trees. This was reasonable notice of rejection of the 200 non-conforming trees, and the buyer is entitled to damages and expenses incurred in selling them for the sellers' account.

On December 14, the sellers by telephone tendered delivery of an additional 600 Scotch Pine trees, allegedly of different origin from the non-conforming Scotch Pine trees sent in the first two deliveries. The buyer refused to accept any further shipment of Scotch Pine trees, at that time, but renewed his demands for other types of trees yet undelivered under the contract. We come now to the question whether the buyer was within his rights in refusing to accept any future shipment of Scotch Pine trees. The starting point is the sellers' right to cure. Section 2–508(1) provides:

"(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery."

The sellers' right to cure under § 2–508 (1) ceases to exist upon expiration of the "time for performance," and the right is conditioned on the sellers' reasonable notification to the buyer of the intention to cure. In the instant case, when the sellers notified the buyer that they had an additional 600 Scotch Pine trees available for delivery, this statement was notice to the buyer of their intention to cure the prior non-conforming deliveries of Scotch Pine. Therefore, whether the sellers could cure by a delivery on December 14 depends upon (1) whether or not the sellers' time for performance had expired and (2) whether the sellers' notice of intention to cure was seasonable.

■ While Friday, December 8, 1967, was the original last date for the sellers' performance of the contract (N.T. 22) the time for performance was written on Exhibit A, a purchase order, as "Pick-Up December 8 and 9." This date was later extended to December 10 at the latest, and the purchase order bears the writing "6–10," which reflects this change in the sellers' date of performance. The buyer later informed the sellers his buyers in New York would have to have the trees by the weekend of De-

cember 16, and that after that date the buyer would have no wholesale market for the trees. The tender of the additional 600 trees was made on December 14. This was within the sellers' time for delivery. This conclusion is bolstered by the fact that the buyer renewed his demands for trees of varieties other than Scotch Pine trees on the same date. In my opinion the tender of the delivery of the 600 additional Scotch Pine trees was within the modified time for the sellers' performance, even if the contract were construed to provide that time was of the essence. The sellers' notification of their intention to cure the earlier non-conforming deliveries of Scotch Pine trees was seasonable under all the circumstances. Therefore, tested by the criteria of § 2–508(1), the sellers had a valid right to cure by the tender of the 600 Scotch Pine trees on December 14.

■ Section 2–612, relating to breach of installment contracts, outlines a buyer's correlative right to cancel the contract for non-conformity of previous installments. Section 2–612(1) defines an "installment contract" as "one which requires or authorizes the delivery of goods in separate lots to be separately accepted." This definition includes installment deliveries tacitly authorized by the circumstances or by the option of either party. *Code Comment* (1). The instant contract tacitly authorized installment deliveries at the option of the parties and is therefore within the class of sales contracts governed by § 2–612 (3), which provides as follows:

"(3) Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments

or demands performance as to future installments."

Assuming, without deciding, that the non-conforming parts of the first two deliveries impaired the value of the whole contract and gave the buyer the right to treat the earlier non-conforming deliveries as a breach of the whole contract, the buyer reinstated the contract on December 14 by demanding delivery in future installments of yet undelivered Douglas Fir and Colorado Blue Spruce.

■ Since the buyer's rejection of the 600 Scotch Pine trees tendered on December 14 was wrongful he is not entitled to recover damages with respect to these trees. For purposes of the computation of damages, the 600 trees the buyer refused to accept are, therefore, treated as conforming deliveries.

■ 2. *Damages.* The measure of damages for non-delivery by the sellers is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages, less expenses saved in consequence of the sellers' breach. 12A P.S. § 2–713(1). In this case, the buyer did not cover; therefore, his sole claims for damages fall into the categories of incidental and consequential damages. The buyer's failure to effect cover does not bar these other remedies. 12A P.S. § 2–712(3).

A. *Incidental Damages:*

Section 2–715(1)[1] provides:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."

The Plaintiff established that by virtue of the sellers' delivery of non-conform-

1. 12A P.S. § 2–715(1).

ing trees he was forced to incur the following additional expenses:

| | |
|---|---:|
| Rental of storage and sales lot | $100.00 |
| Night Watchman | 60.00 |
| Additional labor in selling rejected trees, 8 hrs./day for 5 days at $3.00/hr. | 120.00 |
| | $280.00 |

### B. *Consequential Damages:*

The bulk of the plaintiff's claim falls into the category of consequential damages. On this subject the Uniform Commercial Code provides as follows in § 2-715(2):

"(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;

\*　　\*　　\*　　\*　　\*　　\* "

Count III of the Complaint is a claim for damages for loss of future profits resulting from loss of good will occasioned by the buyer's inability to perform his contracts with florists in New York City whom he was to have supplied during the Christmas season of 1967. Damages of this nature are entirely too speculative for reasonable calculation and none are included in the award herein. Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205, 1225 (3d Cir. 1970), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed. 2d 55 (1970); Harry Rubin & Sons, Inc. v. Consolidated Pipe Company of America, Inc., 396 Pa. 506, 512–513, 153 A.2d 472 (1959); Michelin Tire Co. v. Schulz, 295 Pa. 140, 144, 145 A. 67 (1929).

The balance of the plaintiff's claim is for loss of profits for the 1967 Christmas season occasioned by inability to fulfill his contracts with New York florists for that season. Prior to the adoption in Pennsylvania of the Uniform Commercial Code, the general rule in Pennsylvania governing recovery of damages for loss of profit in contract actions was that set forth in Taylor v. Kaufhold, 368 Pa. 538, 546, 84 A.2d 347, 351 (1951), where the Pennsylvania Supreme Court stated:

"Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provides otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty."

This rule was reaffirmed in Keystone Diesel Engine Company, Inc. v. Irwin, 411 Pa. 222, 224–226, 191 A.2d 376 (1963).

In the instant case, the plaintiff sustained his burden of proving each of the elements of this test of recoverability of lost profits.

### III. CONCLUSIONS OF LAW

1. The buyer rightfully rejected 440 trees of the December 7 shipment and 200 trees of the December 13 shipment.

2. The buyer wrongfully rejected the sellers' tender of 600 Scotch Pine on December 14, 1967.

3. The buyer sustained his burden of proof on consequential damages for lost profits for the non-conforming trees which were delivered and for the undelivered trees called for under the contract.

4. The buyer is entitled to recover $4,801.25 as lost profits.

5. The buyer sustained his burden of proof on incidental damages occasioned by the sellers' breach.

6. The buyer is entitled to recover $280.00 as incidental damages.

7. The buyer retains $1,313.75, the proceeds of the sale of sellers' trees rightfully rejected; the sellers retain $1,421.35 of the buyer's purchase price

for trees not delivered. The buyer is entitled to the balance, or $107.60.

8. The buyer is entitled to judgment in the amount of $4,778.45, exclusive of costs and interest.

9. The buyer is not entitled to recover pre-judgment interest.

10. Costs will be borne by the plaintiff. 28 U.S.C. § 1332(b).