**PURITAN MANUFACTURING, INC.**
**(a Nebraska corporation)**

v.

**I. KLAYMAN & COMPANY (a Pennsylvania corporation).**

**Civ. A. No. 68–564.**

United States District Court,
E. D. Pennsylvania.

June 26, 1974.

---

Ronald S. Sklar, Philadelphia, Pa., for plaintiff.

Donald E. Matusow, Thomas B. Rutter, Philadelphia, Pa., for defendant.

## ADJUDICATION

DITTER, District Judge.

Plaintiff instituted this action to recover the balance due on a contract of sale for machinery. Defendant filed a counterclaim for losses allegedly sustained as a result of plaintiff's breach of warranties, both express and implied. After trial without a jury, I make the following:

## FINDINGS OF FACT

1. Plaintiff, Puritan Manufacturing, Inc., a corporation with its principal place of business in Omaha, Nebraska, is engaged in the business of manufacturing refrigeration equipment for the meat packing industry.

2. Defendant, I. Klayman & Company (hereafter Klayman), a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania, is in the pork packing business.

3. In 1964, Klayman was in the process of making plans for the construction of a new, $3,000,000. facility.

4. Herman Klayman, defendant's manager, learned of a new process for chilling the internal organs and edible portions of the animal's head (hereafter collectively referred to as "offal") by running it through a conveyor and exposing the product to liquid carbon dioxide ($CO_2$).

5. In late 1964 Klayman entered into negotiations with Puritan for the purchase of a variety of machinery including a continuous liver chiller and a continuous head-meat chiller incorporating the process described in finding number 4.

6. Karl Oberdorfer, with whom Klayman negotiated for the purchase of said machinery, was an agent of Puritan, in addition to being employed as a consultant by AIRCO Industrial Gases, a liquid $CO_2$ supplier.

7. On March 15, 1966, W. F. Walter, president of Puritan, submitted a list of equipment and prices for Klayman's consideration.

8. On April 4, 1966, Klayman submitted a purchase order to Puritan, which the latter accepted on May 3, 1966. The equipment actually purchased included a continuous liver chiller, a continuous head-meat chiller, a heart washer, a heart slicer, a lung chiller, a lung slicer, and a stomach deslimer.

9. The agreed upon purchase price was $33,216.00, of which Klayman paid $21,702.90, leaving a balance of $11,513.-10.

10. The equipment ordered by Klayman from Puritan was delivered in November, 1966, and installed in February, 1967.

11. In June, 1970, Klayman dismantled the Puritan liver and head-meat chillers and placed them in storage.

12. The agreed upon purchase price for the liver chiller was $10,275.00 and for the head-meat chiller was $6,900.00, totaling $17,175.00.

13. In addition to an implied warranty of merchantability and an implied warranty of fitness for a particular pur-

pose, Puritan expressly represented and warranted that its chilling equipment would be able to chill the offal product of 650 hogs per hour to a temperature of 50 degrees Fahrenheit, except for livers, which would be cooled to 40 degrees Fahrenheit.

14. Puritan further represented and warranted that its chillers would eliminate "double handling" of the offal product, which is necessary when traditional chilling methods are used.

15. Puritan knew the chillers were purchased so Klayman could continue to sell the livers and other offal products as fresh, rather than frozen.

16. As Klayman's production rose toward a kill rate of 650 hogs per hour, Puritan's equipment was unable to chill the offal to the guaranteed temperatures and at the same time produce, without double handling, livers that could be sold as fresh.

17. Klayman was not only forced to double handle livers but in view of customer complaints lost its market for fresh livers.

18. During the first eight months of operation, the Puritan equipment required constant maintenance, readjustment and replacement.

19. During the first eight months Klayman gave frequent and adequate notice to Puritan that its equipment was not working properly. Besides numerous phone calls, Klayman sent Puritan letters on June 19 and 27, 1967, specifically stating that the seller's machinery was not performing in accordance with its warranties.

20. Puritan and its local representative, AIRCO, made numerous adjustments to remedy various problems and malfunctions in an attempt to enable the chillers to operate properly.

21. In July, 1967, under the supervision of Karl Oberdorfer, modifications were made on the continuous liver chiller, including the installation of an additional $CO_2$ fixture to make "snow" which would be placed on the livers after they dropped into stainless steel tanks. This did not adequately cure the temperature problem as Klayman's production rose.

22. Beginning in October 1967, Klayman had to purchase stainless steel trucks and meat-hanging equipment in order to handle and chill the products not being sufficiently cooled by the Puritan equipment.

23. Klayman spent $10,063.00 for stainless steel trucks and meat-hanging equipment.

24. At a meeting on October 11, 1967, Puritan demanded that Klayman pay the balance due on the purchase price. Speaking for Klayman, Herman Klayman stated he was willing to pay provided Puritan reduced its warranties to writing and agreed to rebuild and replace the equipment at its own expense to conform to the warranties if it became necessary to do so. Puritan refused.

25. During the negotiations for the purchase of the Puritan equipment, Klayman was advised that approximately one pound of liquid $CO_2$ would chill two and one-half pounds of offal to 50 degrees Fahrenheit.

26. In August 1967, Klayman notified Puritan that the $CO_2$ usage was excessive. This was another subject discussed at the meeting on October 11, 1967.

27. In May 1968, Klayman began to purchase bulk dry ice (later pellets) and add it to the offal product to assist in cooling it to the desired temperature.

28. In June 1970, Klayman was processing over 500 hogs per hour. Klayman decided to discontinue using the offal coolers and purchasing liquid $CO_2$. This decision was based on the inability of the Puritan equipment to operate in accordance with its warranties and cool properly the amount of offal product Klayman was producing.

29. Klayman did not establish that its use of $CO_2$ was excessive.

# 1310

## DISCUSSION

■ Since this is a diversity case, the law of Pennsylvania controls,[1] specifically the Uniform Commercial Code, 12A P.S. § 1–101 et seq.

The evidence shows that there was a valid contract for the sale of goods between Puritan, the seller, and Klayman, the buyer, for $33,216.00, of which $11,513.10 remains unpaid.

■■ In March, 1967, Klayman accepted[2] Puritan's equipment and has not at any time notified Puritan that this machinery was rejected. Acceptance by a buyer makes it fully liable for the contract price.[3] Under the Code, the buyer could have revoked his acceptance.[4] There is no evidence, however, that it did so. See Rozmus v. Thompson's Lincoln-Mercury Co., 209 Pa.Super. 120, 123–124, 224 A.2d 782 (1966). Thus Klayman is liable to Puritan for the full amount of Puritan's claim.[5]

There is also Klayman's counterclaim to consider. Klayman's is a family enterprise and its present manager, Herman Klayman, is the fifth generation in the meat packing industry. Having grown up in the business, Herman Klayman is familiar with all its facets and operations and was in charge of making plans for its new three million dollar slaughterhouse, obtaining equipment, and training personnel.

One of the problems in the meat business is refrigeration. As soon as an an-imal has been killed, body heat must be reduced so that color, texture, and purity can be retained. This is true of the internal organs and edible portions of the head (offal products) as well as the rest of the animal.

In its old plant, Klayman chilled offal by placing it in pans and hanging it from hooks in a refrigerated room. After the product cooled sufficiently, it would be brought out and packaged. In the process, each piece of meat was handled twice. An obvious economy would be obtained if this double handling could be eliminated.

During the planning stages of the new slaughterhouse, Herman Klayman learned of the plaintiff's process for chilling offal. Puritan's equipment uses liquid carbon dioxide to chill the meat as it is tumbled along by a turning auger. At the end of the machine, as it was explained to Herman Klayman, the body heat will have been removed and the offal will be available for packing, thus eliminating double handling.

Herman Klayman contacted Karl Oberdorfer, a co-inventor of plaintiff's machine and numerous discussions followed. As a result, Klayman made certain purchases from the plaintiff including a continuous liver chiller and a chiller for the handling of head-meat.

During the period of negotiations, Herman Klayman made known to Puritan his company's specific requirements

---

1. Neville Chemical Co. v. Union Carbide Corp. 422 F.2d 1205, 1210–1211 (3d Cir. 1970).

2. 12A P.S. § 2–606 What Constitutes Acceptance of Goods
(1) Acceptance of goods occurs when the buyer
(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that *he will take or retain them in spite of their nonconformity;* or
(b) fails to make an effective rejection . . . or
(c) does any act inconsistent with the seller's ownership . . . (emphasis added)

3. 12A P.S. § 2–607 Effect of Acceptance
(1) The buyer must pay at the contract rate for any goods accepted.

4. 12A P.S. § 2–608.

5. 12A P.S. § 2–709 Action for the Price
(1) When the buyer fails to pay the price as it becomes due the seller may recover . . . the price
(a) of goods accepted . . .
See Traynor v. Walters, 342 F.Supp. 455, 460 (M.D.Pa.1972) ; United States Plywood Corp. v. Hudson Lumber Co., 127 F.Supp. 489, 496 (S.D.N.Y.), aff'd, 210 F.2d 462 (2d Cir. 1954) ; Marbelite Co. v. Philadelphia, 40 Pa.D. & C.2d 347, 349 (C. P. Philadelphia Cty.), aff'd, 208 Pa.Super. 256, 222 A.2d 443 (1966).

and Puritan expressly warranted its machinery would:

1. Handle 650 hogs per hour;

2. Lower meat temperature to 50 degrees and lower liver temperature to 40 degrees Fahrenheit;

3. Produce offal which could be sold as fresh, rather than as frozen; and

4. Eliminate double handling.

When Klayman's new plant began production in early 1967, Puritan's machinery had been installed. At first, the kill rate was 250 hogs per hour and although the equipment was not trouble-free, it performed in a satisfactory manner. With greater production and warmer weather, however, the problems increased. Adjustments and alterations did not eliminate the difficulties and the double handling of livers had to be undertaken. It also became necessary for Klayman to give up the sale of livers as a fresh product and to sell them frozen at a lower profit margin.

Faced with even more difficulties as the kill rate was advanced, Klayman refused to make payment of the balance due unless Puritan would reduce its warranties to writing and promise to redesign the equipment at its own expense, if necessary, to conform to those warranties. Puritan would not do so, and brought this suit to recover the balance of the purchase price.

Much of the controversy centers around what was meant by the elimination of "double handling." To Herman Klayman this meant that livers could be placed directly into packing boxes as they came from the chilling machine. On the other hand, Karl Oberdorfer testified that the machine had never been intended to produce such results. Instead, it was his idea that a large tub or pan would be placed at the end of the chilling machine; the meat would drop into it and be kept in a refrigerated area for a number of hours. During that time, the surface of the livers, which had become frozen in the chilling machine and the internal portion of the livers which had remained comparatively warm, would become equalized in temperature. The livers could then be packed, and thus, to Oberdorfer's way of thinking, would have only been handled once.

While this may well have been Oberdorfer's intention from the beginning, I conclude that he never made it known to Mr. Klayman, who had seen one of Mr. Oberdorfer's machines operating at a meat packing plant in Iowa. There, the chilled livers were placed immediately into packing boxes and Klayman assumed that the machine which his company was purchasing would accomplish the same results. Oberdorfer testified that it could not do so because the Iowa plant later froze and sold its livers as frozen and Klayman wished to sell livers which it produced as fresh. I conclude that this explanation was not made to Herman Klayman in advance of his purchase from Puritan.

I find persuasive the fact that Klayman made no provision for a liver cooler of the type which Oberdorfer said was required. As Oberdorfer described it, a necessary adjunct to his liver chiller was a cooling room where the livers could be held until the internal and external temperatures were equalized. The only refrigerated area available in the Klayman plant for this purpose was really made for shipping rather than cooling purposes and was approximately a quarter of a mile away from the liver chiller. Thus, the livers had to be carted a quarter of a mile to the cooler and then returned to the area of the chiller to be packed. Herman Klayman's wide experience in the meat packaging industry was not questioned. This was a three million dollar facility and in the planning stages for several years. It is apparent to me that if an adequate explanation had been made to Mr. Klayman as to the requirements for the equalization of internal and external liver temperatures, he would have provided a cooler within a reasonable distance from the end of the chiller. Since there was no cooler, I conclude there was no explanation and

Mr. Klayman was left to believe that the equipment he purchased would produce the same results for the sale of fresh livers as the equipment he saw in Iowa produced for the sale of frozen livers.

The liver and head-meat chiller were therefore unable to produce a salable product at 650 hogs per hour as warranted to Klayman. Thus, Puritan breached the express warranties [6] it had made.[7]

I also find that there was an implied warranty of fitness for a particular purpose.[8] Puritan had full and complete knowledge of the purpose for which Klayman intended to use the chillers. Mr. Walters and Mr. Oberdorfer were the coinventors of the chillers Puritan supplied. As the Third Circuit has stated:

> "Under a warranty of fitness for a particular use, the seller warrants that the goods sold are suitable for the special purpose of the buyer . . ."

Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 296 (3d Cir. 1961). Puritan clearly knew the special purposes for which Klayman purchased the chillers. Klayman relied upon Puritan's judgment, experience and representation that the chillers would fulfill its purpose. See Frigidinners, Inc. v. Branchtown Gun Club, 176 Pa.Super. 643, 648, 109 A.2d 202 (1954); Miller & Co. v. Gibbs, 6 Leb. 344, 352 (C.P. 1958).

Puritan offered several defenses to Klayman's claim that the warranties had been breached. First it was asserted that the unsatisfactory performance of the chillers was due to poor maintenance by Klayman. There was no real evidence, however, to support this position. The damage which was described could have resulted from faulty design and faulty performance as well as from improper maintenance. For example, there was testimony that the lid on the head-meat chiller was bent. Obviously this might have been the result of improper handling, but there was testimony from Klayman's plant superintendent that the meat bunched up around the auger forcing the top of the machine up.

It was also asserted on behalf of Puritan that Mr. Oberdorfer stood ready to adjust the chillers to achieve a capacity of 650 hogs per hour. He said that raising the speed at which the auger turned and the providing of additional coolant by lengthening the intervals when the control valves were open would have made the greater capacity feasible. It is entirely possible that these adjustments would have increased the speed at which the meat was processed, but this still would not have enabled Klayman to pack livers as they came out of the chiller. In short, the

---

6. 12A P.S. § 2–313 Express Warranties
(1) Express warranties by the seller are created as follows:
(a) any affirmation of fact or promise made by the seller to the buyer which relates *to the goods and becomes* part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
"An express warranty will arise where a manufacturer, supplier or other seller positively represents a fact concerning the goods he sells . . ." Tinnerholm v. Parke Davis & Co., 285 F.Supp. 432, 440 (S.D.N.Y.1968), modified, 411 F.2d 48 (2d Cir. 1969).

7. This conclusion is amply supported by the evidence. Not only did the written contract incorporate the warranties by the statement "all equipment sold I. Klayman & Company to be fully guaranteed to operate as efficiently as claims made by manufacturer" but their existence was also admitted by the plaintiff. See N.T. 1–33, 1–59 to 60, 1–119, 21, 22, 2–16. There is no particular form necessary to establish an express warranty. The terms must be sufficiently clear, however, to reasonably conclude the seller intended the buyer to rely on them. Golin v. Sgrignoli, 83 Dauph. 331, 336 (C.P.1965).

8. 12A P.S. § 2–315 Implied Warranty
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the sellers skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose.

end product would have been no more satisfactory to Klayman than was the product at the lower kill rate.

■ Puritan contends that Klayman failed to give notice within a reasonable time of any alleged breach. However, there was a constant flow of letters, telephone messages, and complaints both to Puritan and to its service agent, AIRCO. These constituted adequate and timely notice of the defects in the chillers and the resulting breach of warranties. It is undisputed that AIRCO had its service representative at Klayman's plant constantly in an attempt to make the equipment perform satisfactorily. Klayman afforded ample opportunity to permit Puritan to make changes, adjustments, and alterations in the machinery. Klayman aquiesced when Mr. Oberdorfer added a new $CO_2$ horn and suggested the reinstitution of double handling to get a salable product. This did not, however, constitute a waiver of the breach of warranties. See KLPR TV, Inc. v. Visual Electronics Corp., 327 F.Supp. 315, 325–326 (W.D. Ark.1971), modified, 465 F.2d 1382 (8th Cir. 1972); C.f. Marks v. Lehigh Brickface, Inc., 19 Pa.D. & C.2d 666, 673–677, 73 Dauph. 244, 252–253 (C.P. 1959). What is a reasonable time for notice of a breach of warranty is an issue of fact. Necho Company v. Denise Coal Company, 387 Pa. 567, 570, 128 A. 2d 771 (1957). I conclude that Puritan had adequate and reasonable notice of the breaches of its warranties.

■ Puritan correctly argues that the burden of proof for breach of warranty is on the buyer in regard to goods accepted.[9] Miron v. Yonkers Raceway, Inc., 400 F.2d 112, 119 (2d Cir. 1968); Standard Packaging Corp. v. Continental Distilling Corp., 259 F.Supp. 919, 920 (E.D.Pa.1966), aff'd, 378 F.2d 505 (3d Cir. 1967). Reviewing the evidence I find that Klayman has successfully met this burden.

■ Finally, Puritan contends Klayman waived its right to recover by retaining the equipment and by not first rejecting it and tendering its return. This is not true. The Uniform Commercial Code expands the remedies available to both buyer and seller. One remedy is that the buyer may accept and keep the goods. Then in an action by the seller for the purchase price, the buyer may set off any damages he sustained from any breach of the contract.[10] The only requirement is that the buyer notify the seller of his intention and reason for withholding payment.[11] Klayman's letter of October 17, 1967, satisfies this requirement by stating it will not pay the rest of the purchase price until Puritan guarantees that it will at Puritan's expense replace or redesign the chillers to conform to its warranties. This is adequate notice to Puritan and allows Klayman to set off any provable damages from the amount still due on the contract.

I now come to the question of damages. As stated before, Klayman is lia-

9. 12A P.S. § 2–607(4)

10. 12A P.S. § 2–717 Deduction of Damages From the Price
The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

11. 12A P.S. § 2–717 U.C.C., comment 2.
"Once a buyer has accepted the goods, he still is not without remedy, however, if he gives reasonable notice to the seller of the nonconformity and he may recover all of the losses which are approximately caused by the breach either in an action for damages

for the breach of warranty or in a counterclaim in an action brought against him by the seller . . ." Edmunds Lumber Co. v. Lazier Bros., 103 P.L.J. 447, 449–450 (C. C.P. Allegheny Cty. 1955). See United States Plywood Corp. v. Hudson Lumber Co., 127 F.Supp. 489, 496 (S.D.N.Y.), aff'd, 210 F.2d 462 (2d Cir. 1954); National Container Corp. v. Regal Corrugated Box Co., 383 Pa. 499, 504, 119 A.2d 270 (1956); Marbelite Co. v. Philadelphia, 40 Pa.D. & C.2d 347, 349 (C.P. Philadelphia Cty.), aff'd, 208 Pa.Super. 256, 222 A.2d 443 (1966). See also Vitromar Piece Dye Works v. Lawrence of London, Ltd., 119 Ill. App.2d 301, 256 N.E.2d 135, 138 (1st Dist., Ill.App.Ct.1969).

ble for the contract price because it did not reject the equipment. Klayman, however, is allowed to set off all provable damages proximately caused by Puritan's breach of warranties.

The damages to which Puritan is entitled are set forth in 12A P.S. §§ 2–714(2), (3) and 2–715(2):

> 2–714(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.
>
> 2–715(2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise.
>
>     . . .

■ This section of the Code was recently discussed by the Pennsylvania Supreme Court in K & C, Inc. v. Westinghouse Electric Corp., 437 Pa. 303, 310–311, 263 A.2d 390 (1970). The court held that the true test for damages is the difference between the value of the goods accepted and the value they would have had if they had performed as warranted, which is not necessarily the purchase price. The buyer has the burden of showing that damages are recoverable because "the value received was less than the value [buyer] should have received, absent any breach." *Id.* at 312, 263 A.2d at 395. See Keystone Diesel Engine Co. v. Irwin, 411 Pa. 222, 224, 191 A.2d 376 (1963). There is no question, however, that both parties felt the value of the liver and offal chillers was the purchase price, $17,175.00. This is the value the chillers would have had if they had operated as warranted.

Klayman has shown that they did not operate in the manner warranted and were totally useless once Klayman's production neared its planned level. The reason Klayman continued to use the chillers is that in relying on Puritan's warranties, Klayman did not construct an alternate method of handling the offal product (either a blast or an offal cooler would have cost approximately $100,000). Klayman dismantled the chillers when a new procedure became economical. Klayman is therefore entitled to the difference between the value of the chillers as warranted and as accepted. Since the chillers were of no use to Klayman, except for scrap, the entire value may be recovered as damages. In fairness, Klayman should tender the liver and offal chillers to Puritan which can then reclaim any salvage there might be in the machinery.

■ Klayman also has claims for consequential damages. Although Puritan had knowledge of the particular purposes for which Klayman bought the liver and offal chillers, Klayman was forced to double handle livers and then to sell them frozen. The losses resulting from this were proximately caused by the failure of Puritan's equipment to operate as had been warranted. See KLPR TV, Inc. v. Visual Electronics Corp., 327 F.Supp. 315, 327 (W.D.Ark. 1971), modified, 465 F.2d 1382 (8th Cir. 1972). In an effort to overcome the chillers' deficiencies, Klayman purchased stainless steel offal handling trucks and hooks. The expenditure for this equipment, $10,063., was a direct consequence of Puritan's breach, and for that reason, this element of Klayman's counterclaim must be allowed.

■ Klayman seeks damages for the excess amount of $CO_2$ that it alleges was required to operate the offal chillers. It is undisputed that Karl Oberdorfer said that one pound of $CO_2$ would chill two and one-half pounds of meat. Klayman contends that for the first nine months of the plant's operation—from April to December—on the basis of hogs slaughtered, $CO_2$ usage was excessive by about

25 per cent.[12] However, I did not consider Klayman's evidence to be convincing for several reasons. In the first place, Oberdorfer's statement was based on a yearly average. In the summer, more $CO_2$ will be required than in the cold weather. The nine months for which Klayman seeks damages excluded the winter months, January, February, and March. Secondly, Oberdorfer's claim about $CO_2$ needs was based on cooling to 50 degrees, and not to 40 degrees, the temperature which Klayman wanted to achieve for livers. Thirdly, when a scientific test of the $CO_2$ consumption was performed for plaintiff by Robert Sterling, an AIRCO employee, it established that $CO_2$ usage was approximately that which Oberdorfer said it would be. Finally, Klayman's only documentation was an incomplete file of bills for a part of the period involved. For these reasons, the defendant has failed to carry the necessary burden of proof as to this portion of its counterclaim.

Finally, the claim for the purchase of block and pellet dry ice to cool the offal product is not allowed. Klayman's only evidence to support these damages was a pile of paid bills. There was no showing that Klayman used a greater volume of $CO_2$, represented by the total amount of liquid and solid $CO_2$ because Puritan's chillers did not operate as warranted.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties.

2. The claim and counterclaim are controlled by Pennsylvania law, specifically the Uniform Commercial Code, 12A P.S. § 1–101 et seq.

3. There was a valid contract of sale between the plaintiff and defendant.

4. The defendant accepted the plaintiff's equipment and has not rejected it.

5. The plaintiff made express warranties as to the performance of its offal chillers. There was also an implied warranty of fitness for the defendant's particular purpose. These warranties were relied upon by the defendant.

6. The express and implied warranties were breached by the plaintiff because the chillers could not adequately chill the offal product when the defendant's production approached full capacity, they did not eliminate double handling, and the defendant could not sell the offal product fresh.

7. The defendant notified the plaintiff within reasonable time of the breach of warranties and that it was not going to pay the rest of the contract price.

8. The defendant owes and must pay the plaintiff $11,513.10, the amount due on the contract of sale.

9. The defendant has a valid counterclaim of damages for breach of warranties for $17,175.

10. The defendant has a valid counterclaim of $10,063. for consequential damages proximately caused by breach of warranties by plaintiff.

11. The plaintiff, Puritan Manufacturing, Inc., is liable to the defendant, I. Klayman & Company, in the sum of $27,238. less the balance due for payment on the contract of sale, $11,513.10, or a total of $15,724.90. Klayman is not entitled to interest.

12. Herman Klayman *estimated* that 2,435,120 pounds of offal was produced, for which 974,048 pounds of $CO_2$ should have been required. Instead, 1,241,400 pounds of $CO_2$ were used.