**BARNEY MACHINERY COMPANY, a corporation, Plaintiff,**

v.

**CONTINENTAL M.D.M., INC., a corporation, Defendant.**

Civ. A. No. 75–1338.

United States District Court, W. D. Pennsylvania.

July 20, 1977.

Henry W. Fulton, Jr., David A. McVey, Pittsburgh, Pa., for plaintiff.

John B. Nicklas, Jr., James L. McAneny, Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

In this diversity action the plaintiff Barney Machinery Company (Barney), a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania, sues the defendant, Continental M.D.M., Inc. (Continental) an Indiana corporation, with its principal place of business in Aurora, Indiana (Tr. p. 3). The amount in controversy exceeds the jurisdictional amount.

American Sterilizer Company (Amsco) is a corporate citizen of Pennsylvania located in Erie, Pennsylvania (Tr. p. 3).

Continental is engaged in the business of designing and manufacturing conveyors and combination conveyor-stacker units for sale and resale and for use with metal shears (Tr. pp. 3–4).

Continental advertised itself as having expertise in this field and offered its services to persons who desire to purchase conveyors or conveyor-stacker units for use in that person's business (Tr. p. 4).[1]

Continental advertised itself in trade journals as a company which would design and manufacture a conveyor and/or conveyor-stacker for metal shears (Tr. p. 4).

Mr. David Jarman purchased the assets of Continental in 1970 and became its President. Jarman then had 15 patents for automated conveyor-stacker systems and was advertising new conveyor-stacker models in 1971. Continental sent brochures and sales literature to its distributors including Barney (Def's Ex. BBB). The brochures describe how automation performed by Continental's conveyor-stacker cuts labor costs 30% and is 30% more productive (Def's Ex. A–1, Ex. 3–A).

Amsco desired to increase its productivity and reduce labor and costs (Ex. 3A, A–1), and had purchased a Dreis & Krump (D & K) Shear Model from Barney (Tr. p. 6). It was delivered by D & K to Amsco's plant in December, 1972. After adjustments were made prior to delivery of the conveyor-stacker, this shear operated without malfunction and is still in use.

In October, 1972, Barney inquired of Continental if it would quote the price of a conveyor-stacker unit to be resold by Barney to Amsco for use with a D & K Shear.

Continental understood that the conveyor-stacker unit would be used for a particular purpose, i. e., for use with a D & K Model OHS–10625 Hydraulic Shear (Tr. p. 4) (Ex. 5).

On October 10, 1972, Continental sent Barney quotation No. 70290 for Continental's Shear Conveyor, Model No. MD–10, Chains, Scrap Separator, Stacker, Remote Control Box, Electric Reset Type Counter and Paint and notified Barney that this equipment would be Continental's model as requested, not the D & K Shearmate.[2] The price of the stacker is quoted at $2,545. The total price of the equipment appears to amount to about $12,290 (Exs. 6 & 7).

On October 16, 1972, Barney quoted the price of the equipment to Amsco (Ex. 8).

Neither Barney nor Amsco had any expertise in the use of a conveyor-stacker with a D & K Shear. Consequently, Continental was requested to send a representative to Erie to meet with Barney's Erie salesman, Robert A. Wilner, and Amsco's Methods Engineer, Preston Ohrn, and its foreman, Pat Yezzie.

Complying with the request, Continental sent its Eastern Regional Manager, Edward Ibbotson, to Eire. He met the above-named individuals in Amsco's plant during the first part of November, 1972. Ibbotson was shown the material Amsco worked with, namely, polished stainless steel, nickel clad

---

1. Defendant's objection to Exhibit 4, an advertisement in the November 4, 1974 issue of Metal Working News should have been sustained. The contents of that exhibit have not been taken into consideration.

2. The only difference between a Continental Conveyor-Stacker and a D & K Shearmate is aesthetic, i. e., a different color of paint (Tr. p. 445).

steel, monel, and plain steel. He was told it had to be handled carefully to prevent denting, scratching and marring. He was told the thickness of some of the steel used for hospital operating tables was thirty thousandths of an inch and for some sterilizer material was one-fourth inch. Ibbotson assured those present that there was "no problem"; that Continental's conveyor-stacker would not mar, scratch, or dent the material, and it could convey and stack sheared metal pieces four by six inches in size without any trouble.

Mr. Wilner, Barney's Erie salesman and Messrs. Ohrn and Yezzie, Amsco's representatives, left it to Mr. Ibbotson to recommend what Amsco should have for the particular purpose of handling the aforementioned kinds of steel without scratching, denting or marring, and to revise the quotation for Continental's conveyor-stacker, so that the equipment would work in conjunction with a D & K Model OHS Hydraulic Shear.

The original quotation, No. 70290, was revised by Continental according to Ibbotson's recommendations which revisions were contained in Continental's letter to Barney dated November 27, 1972 (Tr. p. 4, Ex. 9).

The revised proposal (Ex. 9) which superceded the original quotation (Exs. 6, 7) listed a Continental Shear Conveyor Model MD–10, extra wide Conveyor Chain on both sides, "Rubber Bonded Chain Tips" [3] to protect polished material, Scrap Separator, Stacker mounted on a hydraulic lift table equipped with proximity switch, Remote Control Box and Paint. The price of the revised stacker originally priced at $2,545, is quoted at $11,685. The total price adds up to $20,905, but the parties agreed that the total price was $21,080 (Tr. p. 4, Exs. 9, 10). The new proposal (Ex. 9) was signed for Continental by Edward Ibbotson, Eastern Regional Manager.

The basic purchase price quoted on December 4, 1972 by Barney to Amsco was $21,080 (Tr. p. 4).

On January 15, 1973, after the D & K Shear was delivered to Amsco, Mr. Ohrn made measurements of this shear and they were entered on a "Shear Data Sheet" (Ex. 11) sent to him by Continental. This document was forwarded to Continental and was certified by Jim Henke, Continental's chief engineer, on January 30, 1973 (Ex. 11–A).

Barney issued its purchase order (Ex. 13) to Continental on February 21, 1973, No. M3994 for a Continental Shear Conveyor Model MD–10, with stacker as recommended by Ibbotson, which equipment was to be shipped to Amsco for use with its D & K Shear at its Erie plant (Tr. pp. 4–5).

This purchase order specified that the "stacker must be able to handle from .030 polished stainless to ¼ nickel clad without scratching or marring unit."

Amsco placed its order with Barney on February 21, 1973 (Ex. 12). This order contained the same specification quoted above in Barney's purchase order.

Continental accepted Barney's purchase order No. M3994 and proceeded to manufacture the ordered units (Tr. p. 5, Def's Ex. J). The conveyor-stacker was put into the production schedule on February 20, 1973. Blueprints for the machinery were prepared by Continental's engineers in April, 1973.

The conveyor-stacker as ordered was shipped to Amsco on or about June 9, 1973.

Continental, by its invoice No. M5060, dated June 9, 1973, billed Barney for the Continental Shear Conveyor Model MD–10 with attachments which Barney purchased from it for resale in the amount of $18,445 (Tr. p. 5, Ex. 15).

On June 9, 1973, Barney billed Amsco for this equipment in the amount of $21,080 (Ex. 16).

Barney paid Continental the stated amount of its invoice on August 27, 1973 (Tr. p. 5, Ex. 18). Amsco did not pay this bill to Barney. Barney did not receive its expected profit of $2,635.

3. "Tips" is a typographical error for "tops" (Tr. p. 321).

The Continental Shear Conveyor Model MD–10 with stacker was delivered to Amsco in June, 1973, and installed by Continental in Amsco's plant.

Repeated operational problems occurred constantly at Amsco which required stopping production, hand carrying materials and so forth (Tr. p. 5).

From the beginning until Amsco returned the equipment to Continental in December 1974, it failed to function properly.

Upon delivery a caster had been broken off the conveyor in the truck. Pursuant to a call to Continental by Amsco the latter was told to have the caster repaired.

The proximity switch which governed the lift table did not work and another had to be obtained from Continental.

The timing control had the wrong voltage. Continental advised Amsco to replace it; the cost of replacement to Amsco was $400.

The tamping arms bent material coming off the conveyor which was "the least bit skewed." This bent material had to be scrapped.[4]

At times when narrow pieces were sheared they would hang up in the conveyor. This condition required Amsco to have an employee on hand to disengage the hung up narrow pieces.

By the end of June, 1973, Continental was aware that there were serious problems with the stacker portion of the equipment and commenced to redesign it. In July, 1973, about 12 blueprints were prepared by Continental's design department and approved by its chief engineer concerning this stacker. The original stacker was removed by Continental in 1973 and a different style stacker was substituted. No price was mentioned. The substituted stacker did not utilize the expensive lift table which had been installed into the floor behind the shear. The replacement stacker did not function as well as the original stacker and continued to cause the product to be scratched and marred. It also required a different size skid for each set of sheared pieces of different sizes. The stacker problems were never corrected. The original stacker was never returned to Amsco despite the assurance Mr. Jarman made to Mr. Wilner that it would be returned on July 8, 1974.

The lift arms on the conveyor did not function properly in that they did not rise up at the right time.

On or about April 29, 1974, Amsco and in turn Barney notified Continental that the conveyor-stacker system did not function as promised, represented and warranted and that it would be returned as they did not desire to keep it (Exs. 22, 25).

In May, 1974, Amsco and Barney relented as to the finality of rejection and extended Continental one last opportunity to correct the problems with the system. Thereupon, Continental sent Mr. Walton and Mr. Cantey to Erie. On June 1, 1974, these Continental representatives were in a short time able to get the conveyor portion of the system to work harmoniously with the D & K Shear and no further complaints were raised concerning the timing of the shear.[5]

When Continental did not return the original stacker by early September, the extension of time to make changes and corrections was withdrawn. On or about September 23, 1974, Continental was notified that it should pick up the conveyor-stacker system at Amsco's plant (Exs. 32, 36, 38, 40).

Continental did not pick up the equipment and Amsco caused it to be shipped to Continental on December 4, 1974.

---

4. Mr. Jarman, the president of Continental, testified that Mr. Ohrn did not properly set the tamper which resulted in the damage. However, Continental on nine occasions over a one-year period sent representatives to Amsco to attempt to correct problems. We believe Continental had ample opportunity to instruct Mr. Ohrn as to the proper adjustment of the tamper and eliminate Amsco's constant complaints of damage to sheared metal if in fact he was not properly adjusting the tamper.

5. We do not consider Mr. Jarman's timing of the shear in April, 1975 to be relevant to the period Amsco was in possession of the conveyor-stacker system, i. e., June, 1973 to December, 1974.

In the spring of 1975, Mr. Jarman went to Erie and submitted a new proposal for a conveyor-stacker system to Amsco. Representatives from Barney were present. The new proposal differed in several respects from the previous quotations and had a lower price (Ex. 48).

Amsco rejected the new proposal.

Barney has sustained damage by Continental's breach of implied and expressed warranties including loss of $2,635 expected profit.

The court has jurisdiction of the subject matter and the parties. The provisions of Article 2 of the Uniform Commercial Code, 12A P.S. § 2–101 et seq., are applicable.

■ Continental is a merchant under the U.C.C. definition § 2–104:

" 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ."

■ In our opinion Continental impliedly warranted that the Continental MD–10 conveyor-stacker system it quoted to Barney for resale to Amsco would work properly with the D & K Model OHS 10625 Shear ordered by Amsco and would be fit for the particular purpose which Barney and Amsco intended. Continental impliedly warranted that the MD–10 conveyor-stacker system would automate Amsco's Shear operation and would reduce labor cost and increase production. Continental impliedly warranted to Barney that the conveyor-stacker system it quoted for resale to Amsco would operate with a D & K shear and handle sheared metal .030 to ¼ inches thick without scratching, denting or marring.[6] *Lewis v. Mobil Oil Corp.*, 438 F.2d 500 (8th Cir. 1971); *Puritan Manufacturing, Inc. v. Klayman & Company*, 379 F.Supp. 1306 (E.D.Pa.1974); *Tennessee Carolina Transp. Inc. v. Strick Corp.*, 283 N.C. 423, 196 S.E.2d 711 (1973).

Continental impliedly warranted that the conveyor-stacker system was of merchantable quality in that it would work properly with a D & K Shear and handle polished steel, nickel clad, monel and plain steel without damage in an automated manner.[7] *Tennessee Carolina Transp. Inc. v. Strick Corp., supra.*

■ This warranty arises and extends to situations where the goods are purchased for resale. *Ambassador Steel Co. v. Ewald Steel Co.*, 33 Mich.App. 495, 190 N.W.2d 275 (1971). Comment 1 of the U.C.C. 12A P.S. § 2–314 states: "Also the warranty of merchantability applies to sales for use as well as to sales for resale."

■ Continental expressly warranted that its conveyor-stacker system would be able to handle from .030 inch polished stainless steel to ¼ inch nickel clad with denting, scratching or marring. Continental expressly warranted that the conveyor-stacker system designed and manufactured for it for Barney for resale to Amsco would be fit for the special purposes for which Amsco required in its shearing operations.[8]

**6.** The Uniform Commercial Code (U.C.C.) 12A P.S. § 2–315 provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

**7.** The U.C.C. at 12A P.S. § 2–314 provides in part as follows:

"(1) Unless excluded or modified (Section 2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and,

(c) are fit for the ordinary purposes for which such goods are used; and

(3) Unless excluded or modified (Section 2–316) other implied warranties may arise from course of dealing or usage of trade.

**8.** The U.C.C. at 12A P.S. § 2–313 provides in part as follows:

The express warranties were breached.

Barney and Amsco promptly notified Continental of the problems Amsco was having with the conveyor-stacker system, and gave timely notice to Continental of the warranty breaches. 12A P.S. § 2–607(3)(a).

Barney and Amsco properly revoked their acceptance of the equipment after giving Continental ample opportunity to cure and correct the conveyor-stacker system.

The revocation of acceptance by Barney and Amsco was justified because of the various breaches by Continental of the implied and express warranties.

## DAMAGES

Barney is entitled to recover the price paid to Continental on August 27, 1973, in the sum of $18,445 with interest or damages for detention at 6%.[9] Restatement, Contracts § 337. *Cf. Tennessee Carolina Transp. Inc. v. Strick Corp., supra,* 196 S.E.2d at p. 724; *Hussey Metals Div. v. Lectromelt Furnace Div.,* 417 F.Supp. 964 (W.D.Pa.1976).[10]

Pursuant to 12A P.S. § 2–715, Barney is entitled to recover as consequential damages its loss of profit in the sum of $2,635, and incidental damages sustained by Barney, all of which were proximately caused by Continental's warranty breaches, as follows:

> "(1) Express warranties by the seller are created as follows:
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> .    .    .    .    .
>
> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely

1.  After the system failed to work properly, Mr. Wilner, Barney's agent, was required to make additional visits to Amsco's plant to deal with these problems. The time consumed was 33 hours. The cost to Barney at $40 per hour was $1,320.

2.  With respect to these problems other Barney personnel made three special trips to Erie and one to Aurora, Indiana. The time consumed was 36 hours. The cost to Barney was $1,440.

3.  Car expense amounted to $174. Telephone expense amounted to $53.46.

The total incidental and consequential damages amounted to $5,622.46.

The foregoing shall be deemed to constitute the findings of fact and conclusions of law required by Rule 52 Fed.R.Civ.P.

An appropriate order will be entered.

---

the seller's opinion or commendation of the goods does not create a warranty.

**9.** 12A P.S. § 2–711 provides:

> "Where .    .    . the buyer rightfully rejects or justifiably revokes acceptance then .    . with respect to the whole if the breach goes to the whole contract (Section 2–612), the buyer may cancel and whether or not he has done so may .    .    . [recover] so much of the price as has been paid .    .    .."

**10.** Cf. Sales Act, May 19, 1915, P.L. 543, § 70, 69 P.S. 331. Repealed.

> "Nothing in this act shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, or to recover money paid where the consideration for the payment of it has failed."