Charles R. PETERSON

v.

CROWN FINANCIAL CORPORATION.

Civ. A. No. 77–3115.

United States District Court,
E. D. Pennsylvania.

July 20, 1979.

I.

On December 12, 1969, plaintiff Charles R. Peterson, a citizen of Nevada, entered into a security agreement with defendant Crown Financial Corporation, a Pennsylvania corporation, pursuant to which Crown agreed to lend Peterson up to $1,450,000 within 180 days. That same day, Peterson borrowed $1,150,000 from Crown, executing a note payable in two years with interest at two and one-half percent above the prime commercial rate. On December 29, 1969, Peterson borrowed the remaining $300,000, executing a second note payable in two years at the same interest rate.

On July 6, 1970, Crown and Peterson expanded their agreement: Peterson (1) took an additional loan of $3,000,000, (2) pledged 1,100,000 shares of common stock of National Alfalfa Dehydrating and Milling Company as collateral, and (3) executed a third note in the amount of $4,450,000 given in exchange for the notes of December 12, 1969 and December 29, 1969. The interest rate was again set at two and one-half percent above the prime rate, with the first payment due on July 6, 1971, the second payment one year later, and the third payment on July 6, 1973, the date of the note's maturity. On December 29, 1970, before any interest was paid, a fourth note was executed. This note, also for $4,450,-000, was given in exchange for the July 6, 1970 note; it was due on December 29, 1972, with payment of interest, at the same rate as before but, this time, with no interest due until maturity.

In October 1972, Henry S. Faus, Crown's president, wrote Peterson advising him that as matters stood "there [was] no recourse other than full payment of interest" when the note reached maturity at the end of December. The interest due was calculated at $860,837.57.

What transpired between October 1972 and December 1972 is unclear. In December, however, Peterson received a single-page Crown document captioned "Peterson Loan Interest Due December 29, 1972," which showed $499,658.95 as the total of a column entitled "interest amount." This

Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for plaintiff.

Cozen, Begier & O'Connor, Philadelphia, Pa., for defendant.

POLLAK, District Judge.

This commercial law case, in which plaintiff claims that he was coerced into paying defendant $363,875.62 in excess interest, is before the Court on cross-motions for summary judgment.

sum was $363,875.62 less than the $860,837.57 shown in the calculation which accompanied Faus' October 1972 letter. (It apparently was calculated by applying the prime rate to the Peterson loan.) Peterson was unable to pay this reduced sum from his own resources and, on December 21, 1972, with Crown's assistance, Peterson borrowed $500,000 from the First Pennsylvania Bank, which he then remitted to Crown to meet his interest obligation. That same day, F. X. Dalton, Crown's vice-president, wrote Peterson to report:

> We have received in our account $500,000.00 which represents payment of interest due December 29, 1972 on your Note. The $341.15 will be applied to interest after the above date.
>
> Wishing you and your family a very Merry Christmas and a Happy New Year.

The $341.15 mentioned in the Dalton letter is the difference between $500,000 and the $499,658.95 set forth as "Peterson Loan Interest Due December 29, 1972."

Also on December 21, 1972, Peterson executed a fifth note, again in the amount of $4,450,000, this one due in December 1975, with interest, at the same rate as before, and payable at maturity. Simultaneously, there was returned to Peterson the fourth note—the note of December 29, 1970—with the word "cancelled" written across its face.

In late 1975, as the December 21, 1972 note approached maturity, Peterson received from Crown a new computation of interest due. It totalled $1,899,312.05 and included, to Peterson's apparent dismay, $363,875.62 as interest still owed for the period prior to December 31, 1972 under the "cancelled" December 29, 1970 note. When no payment was received, Faus on December 22, 1975, sent Peterson a notice of default:

> Under the terms of a loan and pledge agreement dated July 6, 1970 between you and us (as amended) and your note to us dated December 21, 1972 in the principal amount of $4,450,000, we hereby notify you that as a result of your failure to make the payments required under the note on December 21, 1975 you are in default under the agreement and the note. Accordingly, unless we receive the entire amount due us by January 11, 1976 we will on or after January 12, 1976 pursue all remedies available to us including without limitation (a) private sale of the collateral held under the agreement (terms of sale not yet fixed) and (b) confession of judgment against you and execution thereon.

After that date, events proceeded rapidly. On December 29, 1975, Peterson entered into an agreement with Bass Brothers Enterprises, pursuant to which Peterson agreed to sell 1,304,350 shares of National Alfalfa Dehydrating and Milling Company stock (including the 1,100,000 shares held by Crown) for some eight million dollars. The closing was held on January 7, 1976. At that time Peterson paid off the December 29, 1972 note, including the full $1,899,312.05 in interest demanded on Crown's behalf, and the collateral held by Crown was released. Peterson, however, presented Faus the following letter of protest:

> In connection with the closing of a sale of my shares of National Alfalfa Dehydrating and Milling Company, you have requested that I pay you, in addition to the amount of principal and interest due on the December 21, 1972 Note which the aforementioned stock secures, interest from the period prior to December 21, 1972 in the amount of $363,875.62 which I believe and contend is not due Crown Financial Corporation. However, you have advised me that the pledged stock will not be released until said amount is paid to you. I have advised you and hereby confirm that if the stock is not released at the closing on January 7, 1976, I will not be able to complete the sale or obtain the funds necessary to satisfy Crown Financial Corporation's loan to me.
>
> In view of the fact that I will be unable to sell the National Alfalfa stock unless I obtain a release of the said stock from you, I have no alternative but to pay the $363,875.62 under duress, involuntarily, and under protest.

Crown contends that this letter was handed Faus after payment was tendered; Peterson contends that it was delivered at the same time as payment. Both parties, however, agree that Peterson objected orally to the interest calculation prior to the closing.

On September 8, 1977, Peterson instituted this action to recover "the sum of $363,-875.62, together with interest from January, 1975 [*sic*],[1] punitive damages, a reasonable attorney's fee and his costs."

## II.

█ Crown bases its asserted entitlement to the $363,875.62 in interest on the December 29, 1970 note. Peterson argues, in response that this note was discharged in December 1972 when it was "cancelled" and returned to him. Section 3–605 of the Pennsylvania Uniform Code—which governs this diversity case—speaks to the discharge of negotiable instruments, and provides:

(1) The holder of an instrument may even without consideration discharge any party

    (a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or

    (b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.[2]

The parties divide on the proper interpretation of this provision. Crown argues that Section 3–605 requires proof of "an intent to forgive"; Peterson argues that an "intent to cancel or surrender" is sufficient and that a failure to appreciate the legal consequences that flow from cancellation or surrender does not negative that intent.

Were Crown correct in its interpretation of Section 3–605, relevant issues of fact would still require resolution and therefore summary judgment would be unwarranted.[3]

---

1. The quoted language is from paragraph 20 of the complaint. It would seem the pleader must have meant January, 1976, the month in which plaintiff paid the $363,875.62 under protest.

2. As originally drafted, the Section read:
    (1) The holder of an instrument may even without consideration discharge any party
    (a) by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature, or by writing "cancelled" or equivalent words across the instrument or against the signature; or
    (b) by renouncing his rights by a signed writing or by surrender of the instrument to the party to be discharged.
    (2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto.
And comment one to the section provided that cancellation "must be done in such a manner as to be apparent on the face of the instrument, and the methods stated, which are supported by the decisions, are exclusive." In 1955, this version was considered by the New York Law Revision Commission which noted that the section combined existing provisions of the Uniform Negotiable Instruments Law, but omitted § 123 of that Law, which had provided:
    Cancellation; unintentional; burden of proof.
    —A cancellation made unintentionally, or under a mistake, or without the authority of the holder, is inoperative; but where an instrument or any signature thereon appears to have been cancelled the burden of proof lies on the party who alleges that the cancellation was made unintentionally, or under a mistake or without authority.
The Commission suggested that the omission of the second clause of § 123 could work some change in the law as to burden of proof; it criticized the exclusivity language of comment two, noting that such a provision "encounters some risk of inflexibility and consequent injustice"; and it recommended that the requirement that cancellation be apparent on the face of the instrument be moved from the comments into the section itself. These suggestions inspired the Editorial Board to recommend a change in the statutory language to the wording now in effect. Curiously, the section's comments—now comment one—still instruct that the methods of cancellation stated are exclusive.

3. While Crown has yet to proffer a single document which suggests that the parties intended to carry over the unpaid interest on the December 29, 1970 note after its cancellation (indeed, the Dalton letter suggests just the opposite), Crown would, under its view of the law, be entitled to try to show to the fact-finder that cancellation and surrender were its standard business practice, as it insists they were, and that these practices do not evince a forgive-

But in a case in which the parties regularly deal in commercial paper, Crown's interpretation of Section 3–605 appears mistaken.

■■ While no Pennsylvania court seems to have spoken to the issue, cases from other jurisdictions hold that "[t]he purpose or intent of the holder beyond intent to destroy his evidence of indebtedness is immaterial." *McDonald v. Loomis*, 233 Mich. 174, 206 N.W. 348 (1925). Accord, *Vanauken v. Hornbeck*, 14 N.J.Law Rptr. 178 (1833); *Wilkins v. Skoglund*, 127 Neb. 589, 256 N.W. 31 (1934); *Bryant v. Bowles*, 108 N.H. 315, 234 A.2d 534 (1967); *Beauvais v. Kishfy*, 54 R.I. 494, 175 A. 826 (1934); *In re Pardee's Estate*, 240 Wis. 19, 1 N.W.2d 802 (1942). But see *Fitzpatrick v. Nelson*, 159 Or. 264, 79 P.2d 254 (1938); *Gleason v. Brown*, 129 Wash. 196, 224 P. 930 (1924). This standard does not disadvantage a lending institution. Had Crown, in the instant case, desired to condition renewal on the payment of interest still owing on the December 29, 1970 note, it could have insisted on some contemporaneous writing setting forth that understanding, or it could have demanded that the unpaid interest be added on to the principal before surrendering the old note. Moreover, while it may be hyperbolic to suggest that permitting a party to cancel and surrender a note and then to sue on it "open[s] the door to frauds without number," *Vanauken, supra* at 182, the present controversy at least provides clear evidence that such ambivalent conduct breeds misunderstanding and litigation.

Crown seeks to distinguish the cases which require only an "intent to cancel or surrender" on the ground that, unlike the case at bar, they do not involve a renewal of a pre-existing obligation. But the language of Section 3–605 does not lend itself to such a distinction, and the cases Crown cites for the proposition that discharge of a renewed note requires an intentional forgiveness are less than compelling. Seven of these cases—*Slaughter v. Philadelphia*, 290 F.Supp. 234 (E.D.Pa.1968); *Farmers Union Oil Company v. Fladeland*, 287 Minn. 314, 178 N.W.2d 254 (1970); *First Pennsylvania Bank v. Triester*, 251 Pa.Super. 372, 380 A.2d 826 (1977); *Thorp Finance Corporation v. Ken Hodgins & Sons*, 73 Mich.App. 428, 251 N.W.2d 614 (1977); *Northwest Acceptance Corporation v. Heinicke Instruments Co.*, 441 F.2d 887 (5th Cir. 1971); *Commercial Bank of Middleboro v. Carter*, 418 F.2d 705 (6th Cir. 1969); and *Haggerty v. MacGregor*, 9 Mich.App. 671, 158 N.W.2d 33 (1968)—address the question whether a renewal note discharges an original note where there has been neither cancellation nor surrender. The two other cases relied on by Crown seem to present special fact situations quite remote from the controversy at issue here.[4]

■■ In sum, Section 3–605 seems based on the salutary predicate that those who regularly deal in negotiable instruments ought to be held, as a matter of law, to an understanding of the implications which normal business practice assigns to "intentionally cancelling [an] instrument," or to surrendering an instrument, or to cognate actions. Cf. E. Peters, *A Negotiable Instrument Primer* 49–53 (1974). And there appears no reason to suppose the courts of Pennsylvania would not adhere to this view. Wherefore, since it is undisputed that Crown intended to cancel the December 20, 1970 note and there is no claim that Crown's cancellation was induced by fraud on Peterson's part, the December 29, 1970

---

ness. See generally, David P. Currie, *Thoughts on Directed Verdicts and Summary Judgments*, 45 *Chi.L.Rev.* 72 (1978).

4. In *American Cement Corp. v. Century Transit Mix, Inc.*, 3 U.C.C.Rep. 424 (N.Y.Supreme Ct. 1966), the court concluded that the surrender had been caused by a mistake of fact, if not by fraud. And in *Hanley v. Bank of America National Trust & Savings Ass'n*, 255 Cal.App.2d 439, 63 Cal.Rptr. 161 (1967), the court concluded that periodic partial payments, presented to the bank by one brother, and renewal notes, signed by that brother after each payment, did not operate to destroy (a) the underlying primary obligation to the bank of two other brothers, who made the original note, or (b) the guaranty executed by plaintiff's decedent on behalf of those two brothers.

note must be deemed discharged as a matter of law.[5]

## III.

■ Crown argues that even if cancellation operated to discharge the December 29, 1970 note, summary judgment should not be entered in Peterson's favor because the January 7, 1976 payment constituted a valid and binding accord and satisfaction. This argument is wide of the mark. It has long been Pennsylvania law that payment under protest "import[s] [into] an agreement that existing rights shall not be affected by the payment, but '[shall] be as open to settlement by negotiation or legal controversy as if the money had not been turned over.'" *Hand's Case,* 266 Pa. 277, 109 A. 692 (1920), quoting *Genet v. Delaware & Hudson Canal Co.,* 170 N.Y. 278, 63 N.E. 350 (1902). This sound principle is now embodied in the Pennsylvania Uniform Commercial Code, Section 1–207.[6] Finally, Crown's argument fails because Peterson's claim sounds in restitution, and under the Pennsylvania restitution cases, "when a party is compelled by duress of his person, deeds, papers, or personal property . . . to pay money illegally demanded, from which the party making the payment has no other means of immediate and adequate relief, it is not voluntary but compulsory; and he may rescue himself from such duress by payment of the money under protest and afterwards, on proof of the fact, recover it back." *Lowenstein v. Bache,* 41 Pa.Super. 552, 558 (1910). See also *Smelo v. Girard Trust Company,* 158 Pa.Super. 473, 45 A.2d 264 (1946); *Motz v. Mitchell,* 91 Pa. 114 (1879); *Restatement of Restitution* § 70.

■ There can be little question that Peterson's payment of the $363,875.62 was compelled by duress.[7] Indeed, the facts of this case bear remarkable similarity to those in *Lowenstein, supra.* There, plaintiff paid $832.84 in excess interest in order to recover stock held by defendant as collateral for a loan, and sued for restitution. The Court held:

> thereby prejudice the rights reserved. Such words as "without prejudice", "under protest" or the like are sufficient.

*Hutchinson v. Culbertson,* 161 Pa.Super. 519, 55 A.2d 567 (1947) and *Melnick v. National Airlines, Inc.,* 189 Pa.Super. 316, 150 A.2d 566 (1959) are not to the contrary. In those cases, plaintiff-creditors had accepted checks issued in full satisfaction of disputed claims by their debtors and then brought suit for additional monies. And it was held that "[a creditor] cannot avoid the dilemma of returning the check or keeping it in full satisfaction by erasing or obliterating the words which import complete satisfaction." *Hutchinson, supra* 161 Pa.Super. at 522, 55 A.2d at 568. Whether Section 1–207 was designed to permit a creditor such a remedy is much debated. See White and Summers, Commercial Law, § 13–19. But, in any event, the facts of *Hutchinson* and *Melnick,* in which creditors sued for additional monies, are markedly different from the facts in the instant case, where a debtor has sued to recover payments made under protest.

---

**5.** It should be emphasized that this interpretation of Section 3–605(1)(a) is meant to reach only those creditors who regularly deal in commercial paper. This limitation is required to avoid the harsh results of a case like *State Street Trust Co. v. Muskogee Electric Traction Co.,* 204 F.2d 920 (10th Cir. 1953). There Florence K. Twombly, the plaintiff's decedent, burned sixteen bonds issued by the defendant company after learning from her banker that they were worthless. Ten years later, the company was reorganized, and all bondholders were entitled to a participation of value. The Court of Appeals ruled, however, that Ms. Twombly had discharged the indebtedness, even though she had clearly intended no gift and the company was without knowledge of the destruction until the reorganization was effected. The result has been rightly criticized as unjust. See 5A *Corbin on Contracts* § 1250 at 597 n. 40. Under the interpretation of Section 3–605(1) articulated in this opinion, Ms. Twombly's bonds would continue in force unless, as seems unlikely from the facts set forth by the Court of Appeals, she was shown to be a person regularly dealing in negotiable instruments.

**6.** That section provides:

> A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not

**7.** The Pennsylvania cases make clear that while duress is typically a question of fact "where . . . the relevant facts are not in dispute the question is one of law for the court to decide." *Universal Film Exchanges v. Board of Finance & Revenue,* 409 Pa. 180, 186, 185 A.2d 542, 545 (1962).

The relief to which he was entitled was the immediate possession of his property upon payment of the amount for which it was pledged. He was compelled to pay to the defendants $832.84 more than they were lawfully entitled to claim from him in order to obtain possession of his property which they held as a pledge, and he had no other means of immediate, adequate relief; he paid under protest, notifying them that he would bring an action to recover it back. We are constrained by the weight of authority to hold that this was an involuntary payment and that plaintiff is entitled to recover. 41 Pa.Super. at 559.

This legal principle is a venerable one: "[T]he payment of money by the owner of goods, in order to redeem them from the hands of a person who unlawfully withholds them and demands such money, may be treated as compulsory payment so that the amount is recoverable as having been obtained by oppressive means. The owner of the goods may have so urgent occasion for them that the ordinary action may afford very imperfect redress." *Chitty on Contracts* 625 (quoted in *Motz, supra* at 117). Here, Peterson was required to pay in order to free his collateral and consummate his sale to Bass Brothers Enterprises. Such pressure is sufficiently coercive to constitute duress and require restitution of an undeserved benefit. See *Smelo, supra.*

Crown seeks to distinguish these restitution cases by arguing that Peterson failed to make a timely protest—that "the protest letter was tendered by plaintiff's attorney only after settlement had been concluded." It is unnecessary to decide whether a timely protest is a prerequisite to maintenance of a restitution action because the facts here do not support Crown's version of the timing of events. Affidavits from Charles A. Schnorr and William W. Griffith, Peterson's attorneys at the closing, state that the letter of protest was handed to Faus immediately after a First Pennsylvania Bank employee entered the meeting room to announce that Bass Brothers Enterprises' funds had arrived via wire transfer and immediately prior to delivery of the certificates of stock to Bass Brothers' lawyer. And Faus' own deposition testimony corroborates this account.[8]

## CONCLUSION

Accordingly, Peterson's motion for summary judgment is granted in that: (1) the act of cancellation and surrender discharged the December 29, 1970 note; and (2) the January 7, 1976 payment was made under duress. Peterson is, therefore, entitled to $363,875.62; his entitlement, if any, to interest, attorney's fees, punitive damages, and costs cannot be determined on this record. Finally, Crown's motion for summary judgment is denied.[9]

---

8. Faus testified as follows:
   Q. What happened on January 7, 1976?
   A. We had the settlement.
   Q. When you say "the settlement," what happened physically?
   A. Well, I got paid, Crown Financial got paid.
   Q. Do you remember how the check was payable?
   A. It wasn't a check. It was a bank wire transfer.
   Q. That day?
   A. That day.
   Q. That was pursuant to your indication of the amount that you claimed was owing?
   A. Correct, we were paid in full.
   Q. You were paid in full at the same time you received this letter of January 7?
   A. Correct.

Although Crown argues that Peterson's own deposition testimony acknowledges that the letter of June 7, 1976 was not delivered until after Faus "had been notified that the funds had arrived at the bank," I conclude that the real thrust of plaintiff's deposition is that the letter "was given by Mr. Schnorr to Mr. Faus at the time that the money was being advanced to Mr. Faus for his interest and all."

9. Crown's motion for summary judgment argued that the January 7, 1976 payment was a valid accord and satisfaction—an argument considered and rejected in Part III, *supra*. It also argued that consideration was required to discharge a negotiable instrument. UCC Section 3–605(1) expressly rejects such a consideration requirement.