**Charles R. PETERSON, Appellant in No. 80–2662**

**v.**

**CROWN FINANCIAL CORPORATION, a corporation, Appellant in No. 80–2663.**

**Nos. 80–2662, 80–2663.**

United States Court of Appeals, Third Circuit.

Argued July 21, 1981.

Decided Oct. 20, 1981.

Rehearing and Rehearing In Banc Denied Nov. 10, 1981.

C. L. Robinson (argued), Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for Charles R. Peterson.

Stephen A. Cozen (argued), Richard C. Bennett, Cozen, Begier & O'Connor, Philadelphia, Pa., for Crown Financial Corp.

Before ADAMS, HUNTER and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this diversity case the parties cross-appeal from a final judgment of $441,027.19 in favor of the plaintiff, Charles R. Peterson. This sum represents $363,875.62 in interest charges that Peterson disputed but paid, under protest, to defendant Crown Financial Corporation, together with prejudgment interest of six percent. On appeal, we are asked to resolve two questions of Pennsylvania law.[1] First, is a financial institution that intentionally cancels a promissory note and returns it to the borrower in exchange for a new note, later entitled to collect interest on the first note if such interest is not explicitly "carried over" to the new note? Second, does the trial judge have discretion in a restitution action to award damages in the nature of prejudgment interest in an amount greater than the legal six percent rate?

### I.

Charles R. Peterson is a farmer and rancher residing in Nebraska.[2] On December 12, 1969, he entered into a security agreement with Crown Financial Corporation, a Pennsylvania corporation engaged in the business of installment sales financing, whereby Crown agreed to lend Peterson up to $1,450,000 within 180 days. On the same day, Peterson borrowed $1,150,000 from Crown and executed a promissory note to that effect. Interest on the note was to be calculated at two-and-one-half percent above the prime rate, and was due at maturity. On December 29, 1969, Peterson borrowed the remaining $300,000, at the same rate of interest, and executed a second note.

On July 6, 1970, Peterson and Crown entered into another security agreement, this time for an additional $3,000,000. Peterson borrowed the $3,000,000 and executed a third note for $4,450,000 in exchange for the notes of December 12, 1969 and December 29, 1969. In addition, Peterson pledged 1,100,000 shares of National Alfalfa Dehydrating and Milling Company common stock as collateral for the loan.

Peterson executed a fourth note on December 29, 1970, also for $4,450,000, in exchange for the note of July 6, 1970. Interest, calculated at two-and-one-half percent above the prime rate, was payable at maturity two years later. On October 3, 1972, Henry S. Faus, the president of Crown, sent a letter to Peterson reminding him that the fourth note would reach maturity on December 29, 1972 and advising him that "no further deferral of interest can be granted." The letter was accompanied by a

---

1. The promissory notes in question in this case each state: "This Note was made in and shall be integrated in accordance with the Laws of the State of Pennsylvania." Both the parties and the district court viewed the case as one governed by Pennsylvania law, and there is no basis to question this assumption.

2. Peterson's state of citizenship was incorrectly recorded as "Nevada" in the district court opinion. 476 F.Supp. 1155, 1156 (E.D.Pa.1979).

statement of interest due totaling $860,-837.57.

Ten days before the December 29 maturity date, Crown prepared a statement entitled "Interest Due December 29, 1972," which amounted to only $499,658.85. On December 21, Peterson, with Crown's assistance, borrowed $500,000 from First Pennsylvania Bank to pay the $499,658.85 then due. After signing the $500,000 check over to Crown, Peterson received a letter from F. X. Dalton, Crown's vice president, wishing him a "very Merry Christmas" and noting: "We have received in our account $500,000, which represents payment of interest due December 29, 1972 on your Note. The $341.15 [the difference between the $500,000 paid and the $499,658.85 due] will be applied to interest after the above date."

At the same time, Peterson executed yet another note evidencing his $4,450,000 debt to Crown. This new note matured on December 21, 1975; the previous note—the fourth in the series—was stamped "cancelled" and returned to Peterson.

Shortly before the fifth note came due, Crown advised Peterson that both the principal of $4,450,000 and interest of $1,899,-312.05 would be due and payable on December 21, 1975. The latter figure included $363,875.62 in interest which had been due on the "cancelled" fourth note, but which Peterson claims had been forgiven.[3] No payment was received and Crown notified Peterson that he was in default.

On December 29, 1975, Peterson agreed to sell 1,304,350 shares of National Alfalfa Dehydrating and Milling Company stock—including the 1,100,000 shares pledged as collateral for Crown's loan—to Bass Brothers Enterprises. Peterson planned to use the proceeds of the sale to pay off his debt to Crown. Crown, however, agreed to release the collateral only if Peterson paid the full amount of principal and interest that Crown claimed was due—including the $363,875.62 in interest on the "cancelled" fourth note. Peterson, acknowledging that "I will be unable to sell the National Alfalfa stock unless I obtain a release of the said stock from you," paid the $363,875.62 "under duress, involuntarily, and under protest." He then filed this lawsuit in the Eastern District of Pennsylvania, seeking judgment in the amount of $363,875.62, plus interest and attorney's fees.

The district court determined that, under section 3–605 of the Uniform Commercial Code,[4] Crown's intentional cancellation of the fourth note discharged Peterson's obligation to pay the $363,875.62 in interest as a matter of law. The intent of the parties to extinguish or continue the debt was not, in the view of the district court, relevant. Thus the court granted Peterson's motion for summary judgment on this issue. 476 F.Supp. 1155 (E.D.Pa.1979).[5] In a subsequent opinion, the court held that, although there was "logic" in plaintiff's argument that he was entitled to prejudgment interest in an amount greater than six percent, it nonetheless was bound by Pennsylvania law to limit prejudgment interest to the prescribed six percent "legal" rate. 498 F.Supp. 1177 (E.D.Pa.1980). We will affirm the district court's order compelling Crown to return the $363,875.62 in excess interest to Peterson. Because we hold, however, that the district court has discretion to award damages in the nature of prejudg-

---

**3.** There appears to be a discrepancy in the record as to the amount of interest accrued as of December 29, 1972. The statement dated October 3, 1972 that accompanied the letter of Henry S. Faus shows an amount due of $860,-837.15. The statement of December, 1975 shows, for the same day, an amount due of $863,534.47 (appendix at 1032a). It was apparently from this latter figure that the parties subtracted the December 21, 1972 payment of $499,658.85, leaving a balance due of $363,-875.62. We leave it to the district court to reconcile the two figures.

**4.** That section is presently found in 13 Pa.Cons. Stat.Ann. § 3605 (Purdons 1980).

**5.** The court reserved judgment on Peterson's entitlement to interest, attorney's fees, punitive damages, and costs. By stipulation, the claim for punitive damages was dismissed; the district court later rejected Peterson's claim for attorney's fees. 498 F.Supp. at 1178 n.1.

ment interest in an amount greater than six percent, we will remand the case for reconsideration of the prejudgment interest award.

## II.

Section 3–605 of the Uniform Commercial Code provides:

> (1) The holder of an instrument may even without consideration discharge any party
>
> (a) in any manner apparent on the face of the instrument or the indorsement, as by intentionally cancelling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or
>
> (b) by renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.
>
> (2) Neither cancellation nor renunciation without surrender of the instrument affects the title thereto.

13 Pa.Cons.Stat.Ann. § 3605 (Purdons 1980).

Peterson argues that, under § 3–605, Crown's intentional cancellation of the December 29, 1979 note and intentional delivery of the note to him in exchange for a new note constituted a discharge of Peterson's indebtedness as a matter of law. The district court, believing that no Pennsylvania court had addressed the issue, accepted this position. It reasoned that parties such as Crown, which deal regularly in negotiable instruments, "ought to be held, as a matter of law, to an understanding of the implications which normal business practice assigns to 'intentionally cancelling [an] instrument'. . . ." 476 F.Supp. at 1159. The court thus held that subjective intent not to discharge was irrelevant; mere intent to cancel was sufficient.

We find this reasoning persuasive. Under both traditional common law principles and the Uniform Commercial Code.

> a negotiable instrument is regarded as the debt itself. This conception is due, in part, to the similarity, in form and function, of commercial paper to that of government currencies and bank notes.

> The unitary concept of a debt fused into the written evidence of it, leads readily to the further concept that destruction of the physical res itself by its owner destroys the legal relations which it induces. Consideration is thus not necessary. Cancellation then becomes a sort of constructive tearing up of the instrument.

*Danville UAW–CIO Local No. 579 Credit Union v. Randle,* 58 Ill.App.2d 84, 206 N.E.2d 253, 257 (1965) (quoting W. Britton, Handbook of the Law of Bills and Notes 650 (2d ed. 1961)). Because evidence of the debt merges into the debt itself, intentional cancellation of the instrument works both to destroy the evidence of indebtedness and to discharge the debt. *See State Street Trust Co. v. Muskogee Electric Traction Co.,* 204 F.2d 920, 922 (10th Cir. 1953) ("intentional destruction of a negotiable instrument is the highest evidence of an intention to discharge and cancel the debt represented thereby. . . . In determining whether there has been an intentional cancellation, 'The purpose or intent of the holder beyond intent to destroy his evidence of indebtedness is immaterial.' "); *Bryant v. Bowles,* 108 N.H. 315, 234 A.2d 534 (1967) (note stamped "paid" and delivered to defendant; court holds that "[s]tatutory law makes cancellation or holding by the principal debtor after maturity a discharge of the instrument."). A cancellation made unintentionally, or as the result of a mistake, however, would not effect a discharge of the underlying obligation. *See, e. g., Peoples Bank of South Carolina, Inc. v. Robinson,* 272 S.C. 155, 249 S.E.2d 784 (1978) (debt not discharged when, due to bank's clerical error, promissory note and security agreement were marked "Paid and Satisfied" and were returned to borrowers); *First Galesburg National Bank and Trust Co. v. Martin,* 58 Ill.App.3d 113, 15 Ill.Dec. 603, 373 N.E.2d 1075 (1978) (note stamped "paid" by mistake; no discharge); *American Cement Corp. v. Century Transit Mix, Inc.,* 3 U.S.C.Rep.Serv. 424 (N.Y.Sup.Ct. 1966) (clerical error; no discharge).

Crown does not dispute the foregoing analysis insofar as it pertains to the ordi-

nary cancellation of a negotiable instrument. But it argues that different rules apply when a "renewal note" is issued in exchange for the original note. Specifically, Crown urges that, because a renewal note merely "evidences the same debt by a new promise and does not constitute a payment or discharge of the original note," the court must explore the subjective intent of the parties to determine whether the original obligation has been discharged. Because subjective intent is a question of fact, Crown contends that the district court erred when it granted partial summary judgment and held that Peterson's debt was discharged as a matter of law.

■ Crown is correct in asserting that the question whether a renewal note operates as a discharge of the original note depends on the intention of the parties. This principle is embodied in a number of old Pennsylvania cases,[6] and retains its vitality today. Thus, in *Slaughter v. Philadelphia National Bank*, 290 F.Supp. 234 (E.D.Pa.1968), *rev'd on other grounds*, 417 F.2d 21 (3d Cir. 1969), in which the plaintiff had sued the bank for the wrongful withholding of stock as collateral, the question was whether the exchange of notes constituted an abandonment of the security held for the old note. Declaring that "[w]hether a renewal note is accepted in payment is to be determined from the intent of the parties," and that such intent "is to be determined by the facts and circumstances attending the transaction," the court concluded that the jury had been justified in finding that it was the intent of the parties to discharge the original debt. 290 F.Supp. at 237. Similarly, in *Bank of Austin v. Barnett*, 549 S.W.2d 428 (Tex.Civ.App.1977), the court held that there was no intent to release the security interest in several oil paintings when notes secured by the paintings were marked "Paid by Renewal" and were combined into one note. The court stated:

[T]he giving of a new note for a debt evidenced by a former note does not extinguish the original indebtedness unless such is the intention of the parties. Such intention is never presumed and the burden of proving the discharge or novation is therefore upon the one who asserts it. In general, the renewal merely operates as an extension of time in which to pay the original indebtedness. The debt is not thereby increased. It remains the same; it is in substance and in fact the same indebtedness evidenced by a new promise.... Section 3.605 of the Texas Business and Commerce Code does not appear to alter the rule.

*Id.* at 430.

*Slaughter* and *Bank of Austin* appear, superficially at least, to support Crown's assertion that it is entitled to present evidence of subjective intent. But we find these cases—as well as the others cited by Crown—distinguishable. Most of the cases address the question whether the cancellation of an old note by renewal impairs the security interest underlying the debt. *See Mid-Eastern Electronics, Inc. v. First National Bank*, 455 F.2d 141 (4th Cir. 1970); *Cantrill Construction Co. v. Carter*, 418 F.2d 705 (6th Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398 (1970); *Slaughter v. Philadelphia National Bank, supra; Spector United Employees Credit Union v. Smith*, 45 N.C.App. 432, 263 S.E.2d 319 (1980); *Thorp Finance Corp. of Wisconsin v. Ken Hodgins & Sons*, 73 Mich.App. 428, 251 N.W.2d 614 (1977); *Bank of Austin v. Barnett, supra*. A number of other cases deal with the issue whether the negotiation of a new note discharges the guarantors or co-makers of the old note. *See, e. g., Northwest Acceptance Corp. v. Heinicke Instruments Co.*, 441 F.2d 887 (5th Cir. 1971); *Farmers Union Oil Co. v. Fladeland*, 287 Minn. 315, 178 N.W.2d 254 (1970); *Holland v. First National Bank in Dallas*, 597

---

**6.** *See, e. g., Brown v. Scott*, 51 Pa. 357, 363 (1865) ("if one indebted to another by note gives another note to the same person for the same sum, without any new consideration, the second note shall not be deemed a satisfaction of the first, unless so intended and accepted by the creditor, and ... the intention with which it was received must be submitted to the jury"); *Seltzer v. Coleman*, 32 Pa. 493 (1859) (same).

S.W.2d 406 (Tex.Ct.Civ.App.1980); *Haggerty v. MacGregor,* 9 Mich.App. 671, 158 N.W.2d 33 (1968).

We have been directed to no case, however, in which the *amount* of indebtedness—as contrasted with the underlying security interest or liability of a co-signer—is in dispute. In the latter cases, the debt itself remains constant; when the parties renegotiate the schedule of repayment, they call into question the continuity of other, collateral provisions of the original note. In the present case, however, the debt itself is at issue. When Crown intentionally cancelled and returned the first note in return for a new note, it did not renew the $363,-875.62 interest charge; rather, it annulled the one document that evidenced Peterson's debt for that amount. In such a situation, we agree with the district court that the lending institution is deemed *as a matter of law* not to have intended that the old indebtedness survive. Subjective intent under these circumstances is irrelevant; in the absence of clerical error or other mistake— neither of which is claimed here—the lender cannot, consistent with the dictates of § 3–605, remain free to insist upon the terms of a cancelled note simply because it did not subjectively intend to alter its terms. The commercial world—"dependent upon the necessity to rely upon documents meaning what they say," *Safe Deposit Bank and Trust Co. v. Berman,* 393 F.2d 401 (1st Cir. 1968)—could hardly be expected to function smoothly were we to conclude otherwise.

■ Because we hold that Crown's cancellation and surrender of the December 27, 1970 note was sufficient as a matter of law to discharge the $363,875.62 debt not explicitly carried over into the new note, we find it unnecessary to review the documents and testimony presented to the court as evidence of intent or lack thereof.[7] The deci-

sion of the district court, insofar as it ordered restitution of the $363,875.62 payment to Peterson, will therefore be affirmed.

### III.

We turn now to the issue of prejudgment interest.[8] Neither party disputes the district court's holding that Peterson was entitled to prejudgment interest on the sum he unwillingly paid to Crown. The question on appeal is rather the *rate* of interest properly chargeable to Crown under Pennsylvania law.

The district court conceded that "[t]here is considerable logic in plaintiff's contention that 2½ points above prime would be a singularly equitable measure of prejudgment interest in this case," 498 F.Supp. at 1179. Nonetheless, the court concluded that it did not believe that it had discretion to award prejudgment interest at a rate greater than six percent, the legal rate in Pennsylvania. 41 P.S.A. § 202 (Purdons Supp. 1981). The court determined that six percent was "the applicable interest rate in contract-related claims," *Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.,* 439 F.Supp. 671, 677 n.7 (E.D.Pa.1977), aff'd 582 F.2d 1276 (3d Cir. 1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979), and noted that, even if Peterson's claim could fairly be characterized as an equitable claim for restitution, "six percent remains the appropriate measure." 498 F.Supp. at 1180 (citing *Nationwide Mutual Insurance Co. v. Philadelphia Electric Co.,* 443 F.Supp. 1140 (E.D.Pa.1977)).

■ We agree with the district court that, under Pennsylvania law, prejudgment interest in the ordinary suit for contract damages is limited to the six percent legal rate. But because Peterson's claim sounds in restitution, it calls for the exercise of the

---

**7.** Peterson argues strenuously that, even were the court to require additional evidence of intent, he would nonetheless prevail.

**8.** As will be discussed *infra,* prejudgment "interest" *as such* in Pennsylvania is conceptually distinguishable from detention damages *in the*

*nature* of interest. For simplicity's sake we will use the term "prejudgment interest" throughout this opinion to refer generically to both types of awards; we will make specific reference to "interest as such" or "damages in the nature of interest" when necessary.

court's broader equitable powers. Under our reading of the relevant Pennsylvania precedents, the trial judge does have discretion in such cases to award damages in the nature of prejudgment interest in an amount greater than six percent.

### A.

The law of Pennsylvania with respect to the rate of prejudgment interest is far from perspicuous. It is clear, however, that in contract actions, the prejudgment interest award properly is measured by the legal rate. Thus, in *Miller v. City of Reading*, 369 Pa. 471, 87 A.2d 223 (1952), the Pennsylvania Supreme Court held that, in an action of assumpsit to recover the principal and interest on a municipal bond, the bondholder was entitled to interest at the legal rate of six percent rather than at the five percent rate specified in the bond. Justice Stern stated:

> Whenever one man binds himself to pay a specific sum of money to another by a certain day, and he fails to do so, he becomes liable, by the *law* of this State, to pay interest thereon at the rate of six percent per annum afterwards, as long as he shall improperly withhold payment thereof, unless, perhaps, it should be expressly agreed otherwise by the parties.

87 A.2d at 226 (emphasis in original). Justice Stern expressed similar sentiments in *Nagle Engine & Boiler Works v. City of Erie*, 350 Pa. 158, 38 A.2d 225 (1944): "When a definite time is fixed for the payment of money the law imposes the obligation to pay damages by way of interest at the legal rate, for the detention of the money after the breach of the contract for its payment," 38 A.2d at 228 (quoting *West Republic Mining Co. v. Jones & Laughlins*, 108 Pa. 55, 68 (1885)). This legal principle is reflected in § 337(a) of the Restatement of Contracts, which was explicitly adopted by the Pennsylvania Supreme Court in *Penneys v. Pennsylvania Railroad Co.*, 408 Pa. 276, 183 A.2d 544 (1962). That section states:

> If the parties have not by contract determined otherwise, *simple interest at the statutory legal rate is recoverable as damages for breach of contract* as follows:
>
> (a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculations from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.

Restatement of Contracts § 337(a) (1932) (emphasis added).

The court is thus obligated to award "simple interest at the statutory legal rate" only in those circumstances in which the plaintiff proves that the defendant breached a promise to pay "a definite sum of money," or render a performance the value of which is ascertainable with exactitude. In such a case, the plaintiff is entitled to interest at the six percent legal rate as a matter of law. *See, e. g., Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.*, 439 F.Supp. 671 (E.D.Pa.1977), *aff'd* 582 F.2d 1276 (3d Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979); *Barney Machinery Co. v. Continental M.D.M., Inc.*, 434 F.Supp. 596 (W.D.Pa. 1977); *Formigli Corp. v. Fox*, 348 F.Supp. 629 (E.D.Pa.1972); *cf. Hussey Metals Division v. Lectromelt Furnace Division*, 417 F.Supp. 964, 968–69 (W.D.Pa.1976) (interest not allowed because the damages "can in no way be characterized as a 'definite sum' "), *aff'd* 556 F.2d 566 (3d Cir. 1977).

In tort cases, prejudgment interest is not allowable as a matter of law. The Pennsylvania courts have instead awarded "compensation for delay" or "detention damages" at the prejudgment stage. The contours of this remedy were first delineated in *Citizens' Natural Gas Co. v. Richards*, 130 Pa. 37, 18 A. 600 (1889), in which the Court explained:

Interest, as such, is recoverable only where there is a failure to pay a liquidated sum, due at a fixed day, and the debtor is in absolute default. It cannot, therefore, be recovered in actions of tort, or in actions of any kind where the damages are not in their nature capable of exact computation, both as to time and amount. In such cases, the party chargeable cannot pay or make tender until both the time and the amount have been ascertained, and his default is not, therefore, of that absolute nature that necessarily involves interest for the delay. But there are cases sounding in tort, and cases of unliquidated damages, where not only the principle on which the recovery is to be had is compensation, but where, also, the compensation can be measured by market value or other definite standard. Such are cases of the unintentional conversion or destruction of property, etc. Into these cases the element of time may enter as an important factor, *and the plaintiff will not be fully compensated unless he receive not only the value of his property, but receive it, as nearly as may be, as of the date of his loss.* Hence it is that the jury may allow additional damages in the nature of interest for the lapse of time. It is never interest as such, nor as a matter of right, but compensation for the delay, *of which the rate of interest affords the fair legal measure.*

*Id.* at 600 (emphasis added).

The distinction between interest, as such, and compensation for delay, has continued to trouble the courts. *See, e. g., Hussey Metals Division v. Lectromelt Furnace Division, supra,* at 967 ("Logic does not inherently require separate rules where the loss

of use of property or detention of damages results not from tort but from breach of contract."); *Marrazzo v. Scranton Nehi Bottling Co.,* 438 Pa. 72, 263 A.2d 336 (1970); *Tennessee Carolina Transportation, Inc. v. Strick Corp.,* 283 N.C. 423, 196 S.E.2d 711 (1973) (applying Pennsylvania law). *See generally* Comment, *Allowance of "Interest" on Unliquidated Tort Damages in Pennsylvania,* 75 Dick.L.Rev. 79 (1970). Indeed, it has played a significant role in the present appeal. Peterson, sensing greater flexibility in the tort remedy, contends that Crown committed the tort of business coercion when it "forced" him to pay the $363,-875.62 overcharge. He thus argues that he is entitled, not to "interest," but to detention damages; and further, that the amount of such damages is not governed by the six percent legal rate established at 41 P.S.A. § 202.[9] Crown, on the other hand, stresses the contractual nature of Peterson's cause of action. Crown maintains that because Peterson seeks a "definite sum" of money, he is entitled, under § 337(a) of the Restatement of Contracts as adopted by the Pennsylvania courts, to interest at the six percent legal rate—no more, and no less.

We decline to accept Crown's contention that the case at bar falls under the § 337(a) rubric. That section, as adopted and applied in Pennsylvania, addresses only the situation in which the defendant "commits a breach of a contract to pay a definite sum of money" and the plaintiff sues for contract damages. Without exception, the case law reflects this precise scenario. *See, e. g., Sun Shipbuilding & Dry Dock Co. v. United States Lines, Inc.,* 439 F.Supp. 671 (E.D.Pa.

**9.** The question of the applicable interest rate has been raised infrequently in the tort context. Those courts that have addressed the issue have apparently adhered to the six percent legal rate. *See, e. g., Hussey Metals Division, supra,* at 967; *Tennessee Carolina Transportation, Inc., supra,* at 440, 196 S.E.2d 711. In 1978, the Pennsylvania Supreme Court adopted Pennsylvania Rule of Civil Procedure 238, which provides that "in an action seeking monetary relief for bodily injury, death or property damage, or any combination thereof, the court . . . shall . . . add to the amount of compensa-

tory damages . . . damages for delay at ten (10) percent per annum, not compounded. . . ." This rule was recently adjudicated unconstitutional, *Laudenberger v. Port Authority of Allegheny County,* No. GD 78–5062, 128 Pittsburgh L.J. 319 (Ct. Common Pleas, Allegheny County, July 28, 1980), *appeal docketed,* No. 80–1–160 (Pa.S.Ct. Aug. 12, 1980). The ultimate disposition of the *Laudenberger* case by the Pennsylvania Supreme Court does not affect our decision in the case at hand, which is not an action seeking monetary relief for bodily injury, death, or property damage.

1977), *aff'd* 582 F.2d 1276 (3d Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979); *Barney Machinery Co. v. Continental M.D.M., Inc.*, 434 F.Supp. 596 (W.D.Pa.1977); *Hussey Metals Division v. Lectromelt Furnace Division*, 417 F.Supp. 964 (W.D.Pa.1976), *aff'd* 556 F.2d 566 (3d Cir. 1977); *Formigli Corp. v. Fox*, 348 F.Supp. 629 (E.D.Pa.1972); *Penneys v. Pennsylvania Railroad Co.*, 408 Pa. 276, 183 A.2d 544 (1962); *Miller v. City of Reading*, 369 Pa. 471, 87 A.2d 223 (1952); *Nagle Engine & Boiler Works v. City of Erie*, 350 Pa. 158, 38 A.2d 225 (1944). In the case at bar, however, Crown did not breach a promise to pay Peterson the $363,875.62 in dispute. It made no promises; as the district court found, it simply extracted the money from Peterson, forcing Peterson to sue, under a restitution theory, for its return. There is nothing in either the language of § 337(a) or the relevant Pennsylvania precedents to suggest that a plaintiff can recover only "single interest at the statutory legal rate ... as *damages for breach of contract*" in a case such as this.

We agree with Peterson that—in this situation—the district court has discretion to award damages in the nature of prejudgment interest at a rate higher than the statutory six percent rate. Our holding is based not on our characterization of the underlying substantive dispute, but rather on the equitable nature of the remedy the plaintiff seeks—restitution of money unjustly received. We thus find it unnecessary to decide whether, as Peterson urges, Crown's conduct constituted the tort of business coercion.

### B.

▮ That Peterson's claim rests upon equitable considerations is not disputed. The district court held that Peterson is entitled to "restitution of an undeserved benefit" from Crown. 476 F.Supp. at 1161. Under Pennsylvania law, "when a person receives a benefit from another, and it would be unconscionable for the recipient to retain that benefit, the doctrine of unjust enrichment requires the recipient to make restitution. ... This *equitable doctrine* imposes on the recipient an obligation in the nature of quasi contract." *Myers-Macomber Engineers v. M.L.W. Construction Corp.*, 271 Pa. Super. 484, 414 A.2d 357 (1979) (emphasis added). *See also Binns v. First National Bank of California, Pennsylvania*, 367 Pa. 359, 80 A.2d 768, 775–76 (1951) (referring to the "equitable principle of restitution and unjust enrichment"). *See generally* D. Dobbs, Remedies (1973).[10]

In resolving Peterson's equitable claim, we are guided by the mandate of the Pennsylvania Supreme Court in *Murray Hill Estates, Inc. v. Bastin*, 442 Pa. 405, 276 A.2d 542 (1971). There, the Court stated that, in equity cases,

> The decided trend of courts of law and courts of equity has been "to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case" ... Unless a case be found, which is a conclusive precedent, the safest and at the same time the fairest way for a court is to decide questions pertaining to interest according to a plain and single consideration of justice and fair dealing.

*Id.* at 545 (quoting *McDermott v. McDermott*, 130 Pa.Super. 127, 130, 196 A. 889 (1938)).

The flexible approach advocated in *Murray Hills Estates* has been followed by the

---

10. Lord Mansfield provided one of the earliest analyses of the remedy of restitution. *In Moses v. MacFerlan*, 2 Burr. 1005, 97 Eng.Rep. 676, 680–81 (K.B.1760), an action in assumpsit, he stated:

> This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies ... for money paid by mistake; or upon a consideration which happens to fail; or for money got through imposition, (express, or implied) or extortion; or oppression; or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances.
>
> In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money.

Pennsylvania Supreme Court on several occasions. In *In re Kenin's Estate*, 343 Pa. 549, 23 A.2d 837 (1942), for example, which involved the wrongful investment by a trustee of the proceeds of insurance policies, the Court concluded that the trustee was liable for "interest as damages for detention." *Id.* at 844. Stating that "[t]here is no statutory requirement that damages for the detention of funds be measured by the legal rate of interest for the period of the detention," the Court added:

> The Act of May 28, 1858 [the predecessor to 41 P.S.A. § 201] ... fixing at 6% the lawful rate of interest for the loan or use of money, in all cases where no express contract shall have been made for a less rate does not rule the question of "damages for detention." The word "use" when referring to money is often employed as a synonym for "loan." Money is not "used" within the meaning of this act when it is detained under the circumstances here present.

*Id.* at 844 n.4. Finding that, if safely invested, the proceeds could not have yielded more than two-and-one-half percent per year, the Court reduced the interest rate for detention damages from six percent to two-and-one-half percent for the six-year period during which the trustee had improperly collected and distributed the funds.

The district court here read *Kenin's Estate* as according the courts discretion to set prejudgment interest at a rate *lower* than six percent when the prevailing rate of return is below the legal rate. Indeed, subsequent cases have cited *Kenin's Estate* for that proposition. *See, e. g., In re Lewis' Estate*, 349 Pa. 455, 37 A.2d 559, 562 (1944) (4%). *Cf. In re Keener's Estate*, 413 Pa. 267, 196 A.2d 321 (1964) (rate earned by savings account during time period in question is proper rate); *In re Jones' Estate*, 400 Pa. 545, 162 A.2d 408, 417 (1960) (rate increased from 3% to 6%). We believe, however, that the principles upon which *Kenin's Estate* relied are broad enough to permit the courts discretion to adjust rates upwards or downwards as economic realities and fairness require.[11] As the Pennsylvania Supreme Court declared, "[d]amages for the detention of money under the circumstances here present should be measured by what the money so detained would have produced if it had been delivered to those entitled to it." 23 A.2d at 844.

The recent case of *Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980), supports our conclusion. In *Sack*, an equity action, one sister alleged that an older sister had fraudulently converted savings bonds, placed by the mother in a trust for the younger sister, to the older sister's account. The Chancellor found that the older sister had abused a confidential relationship between herself and her mother, and consequently imposed a constructive trust for the benefit of the younger sister. But the Chancellor refused to award pre-verdict interest, believing that Pennsylvania law permitted interest to run only from the date of the verdict. 413 A.2d at 1063. The Pennsylvania Supreme Court disagreed. "First, the plain words of the act [allowing post-verdict interest] do not speak of pre-verdict interest and do not expressly bar such interest. Second, after passage of this act, this Court has on occasion allowed awards of pre-verdict interest." 413 A.2d at 1064. While the Court based its reasoning in part on the need to hold fiduciaries accountable both for the profit and the interest gained from a wrongful use of the beneficiaries' funds, it also engaged in a substantial discussion of the wide scope of its theory on the applicability of pre-verdict interest. As the Court explained, the underlying principle was the prevention of unjust enrichment:

---

**11.** This is concededly not true in the estates area. The Pennsylvania legislature has mandated that when a personal representative commits a breach of duty with respect to such assets, he shall, "in the discretion of the court, be liable for interest not exceeding the legal rate on such assets." 20 Pa.Cons.Stat.Ann. § 3544 (Purdons 1975). We find no basis for concluding that the reach of this statute should be extended any further than its literal context. *But see Nedd v. United Mine Workers*, 488 F.Supp. 1208, 1215 (M.D.Pa.1980) (court relies on § 3544 to justify discretion in union breach of trust case).

Hence, any claim based upon unjust enrichment or restitution, rather than upon compensation or damages, not only permits pre-judgment interest, but also permits an award of compound interest.

Because all of this was most obvious in fiduciary cases, and because those cases were decided in equity courts, the generalization often made was that interest *would be permitted in equity*, as a matter *of the chancellor's discretion*, even where not permitted at law because the claim was unliquidated. The principle behind this, however, is clearly broader than the scope of purely equitable actions: it is a principle based upon unjust enrichment notions. For that reason it should be stated, not as a rule about equity, but as a rule about restitution. Whenever the defendant holds money or property that belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment, interest upon the funds or property so held may be necessary to force complete restitution. This may be true in law as well as in equity.

413 A.2d at 1065 (emphasis in original) (quoting D. Dobbs, Remedies 169–70 (1973)) (footnotes omitted).

Concededly, *Sack v. Feinman* does not by its terms resolve the issue before us today. At oral argument, counsel for Crown urged that, at most, *Sack* stands for the proposition that the court has discretion to award prejudgment interest in any amount *up to* the six percent rate. While *Sack* conceivably can be so read, we remain unconvinced. The language and the logic of the case— and the lack of conclusive precedent to the contrary—compel the holding that, in the restitution context at least, the court has discretion to award damages in the nature of prejudgment interest at a rate higher than the six percent legal rate.[12] Our conclusion is buttressed by the fact that in *Sack* the Court sanctioned the award of *compound* interest. This in itself is considerably more generous than the "simple interest" allowable in a contract action. *See* Restatement of Contracts § 337(a).[13]

We concede, too, that it is difficult to draw a logical distinction between the present case—a wrongful demand and acceptance of a sum paid under protest—and

12. *Nationwide Mutual Insurance Co. v. Philadelphia Electric Co.*, 443 F.Supp. 1140 (E.D.Pa. 1977), which was cited by the district court, does not counsel otherwise. In that case, though the court relied upon a restitution theory in awarding interest at the six percent rate, it did not consider the question whether it had discretion to award interest at a higher rate. Section 156 of the Restatement of Restitution, upon which the court rested its holding, significantly does not mention the rate at which interest is to be awarded. We surmise that the court adopted the legal rate because such rate is specified in § 337 of the Restatement of Contracts. That section was also cited in the court's opinion. 443 F.Supp. at 1149.

13. Our holding is not without precedent in other jurisdictions. *See, e. g., Davis Cattle Co. v. Great Western Sugar Co.*, 544 F.2d 436, 441 (10th Cir. 1976) (11.5% award upheld; "The true measure of monetary interest is the *benefit* to the wrongdoer, and ... the statutory rate should be used only in the absence of proof as to the benefit accruing to the wrongdoer as the result of his wrongful detention"), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977); *E. I. DuPont de Nemours & Co. v. Lyles & Lang Construction Co.*, 219 F.2d 328, 342 (4th Cir. 1955) ("the interest should be computed not at the legal rate fixed by statute but at

the rate plaintiff would have had to pay upon a loan of a similar amount, considering the state of the money market and the rate charged by banks for the use of money"), *cert. denied*, 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955); *Employer-Teamsters Joint Council No. 84 v. Weatherall Concrete, Inc.*, 468 F.Supp. 1167 (S.D.W.Va.1979) (8% award, citing *DuPont, supra* ); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497 (Del.1981) (7% award); *First City National Bank of Paris v. Haynes*, 614 S.W.2d 605, 610 (Tex.Civ.App.1981) (10% award; "In prejudgment interest cases the trend is to hold its award to be a matter within the sound discretion of the trial judge"); *Rollins Environmental Services, Inc. v. WSMW Industries*, 426 A.2d 1363, 1366 (Del.Super.1980) ("allowance of interest in cases following within equity jurisdiction has been held to be within the discretion of the Chancellor ... and in the exercise of that discretion the interest rate has not been considered to be a fixed 'legal rate,' but has varied according to a showing of the rate which a prudent investor could have obtained."). But cf. *Wooten v. McClendon*, 272 Ark. 61, 612 S.W.2d 105 (Ark.1981) (prejudgment interest rate limited to legal rate in property damage action).

the refusal to pay funds due under a contract. It may be inequitable to require debtors to pay only six percent under present Pennsylvania law yet force creditors who have made wrongful demands to disgorge at money-market rates. As to the former situation, however, Pennsylvania has provided clear—if questionable—precedent to which a federal court sitting in diversity is bound. In the present case, to the contrary, we find support in the Pennsylvania case law for the proposition that prejudgment interest in restitution awards can be set at the trial court's discretion, and find no conclusive precedent to the contrary. Mindful of "those considerations of basic fairness and equity which suggest a more flexible rule . . ., [and] not unmindful of the fact that at the currently high money-market rates [a contrary] ruling appears to create a built-in incentive to withhold sums due, and indeed, to prolong litigation," 498 F.Supp. at 1180 n.5, we will remand the case for a redetermination by the district court of the damages for delay, which may be set at a rate greater than Pennsylvania's legal rate of interest.

Affirmed in part, vacated in part, and remanded.